[No. 82238-7. En Banc.]

Argued January 14, 2010. Decided January 13, 2011.

THE STATE OF WASHINGTON, *Respondent*, v. PATRICIA SUE
SCHULTZ, *Petitioner*.

*Manek R. Mistry* and *Jodi R. Backlund* (of *Backlund & Mistry*), for petitioner.

*Deborah S. Kelly, Prosecuting Attorney*, and *Brian P. Wendt, Deputy*, for respondent.

¶1 CHAMBERS, J. — Patricia Sue Schultz was convicted of possession of illegal drugs after police entered her home without a warrant and discovered evidence of drug possession. Schultz contends that the search was unlawful and the evidence obtained must be suppressed. The State contends the warrantless search was justified under the emergency aid exception to the warrant requirement. The Court of Appeals upheld the search, concluding the potential for domestic violence justified the entry into the home and, alternatively, that Schultz consented to the search because she acquiesced to the entry. We recognize that domestic violence presents unique challenges to law enforcement and courts. We hold that the likelihood of domestic violence may be considered by courts when evaluating whether the requirements of the emergency aid exception to the warrant requirement have been satisfied. We further hold that mere acquiescence to an officer's entry is not consent and is not an exception to our state's constitutional protection of the privacy of the home. Finally, we hold the State has not shown that its entry into Schultz's home was justified by the emergency aid exception to the warrant requirement. Schultz's motion to suppress should have been granted. We reverse.

FACTS

¶2 On April 4, 2004, Sequim police received a phone call from a resident of an apartment complex about a yelling male and female. Officers Kori Malone and Michael Hill responded to the call. Upon arriving at the apartment, Officers Malone and Hill stood outside and overheard a man and woman talking with raised voices.[1] They specifi-

---

[1] The trial court found that the officers had heard "yelling." Clerk's Papers at 20; Report of Proceedings (Aug. 2, 2005) at 137. The court used the term "yelling"

cally overheard the man say that he wanted to be left alone and needed his space.

¶3 According to the officers, Officer Malone knocked on the apartment door and Schultz answered. Schultz appeared agitated and flustered. Officer Malone asked Schultz where the male occupant of the apartment was. Schultz denied that anyone else was there. Officer Malone told Schultz that she had heard a male voice in the apartment. Schultz called for Sam Robertson, who emerged from a nearby bedroom. Schultz then stepped back and opened the door wider, and Officer Malone followed Schultz inside.

¶4 Schultz testified to a slightly different version of events. According to Schultz, after she said no one else was in the apartment, the officers told her they had heard a male voice and were coming in. Schultz said that she stepped to the side because the officers were entering. Under either version, it appears that neither officer requested permission to enter the apartment, nor did the officers inform Schultz or Robertson that they could refuse a search. Neither Schultz nor Robertson asked the officers to leave nor attempted to prevent their entry. The trial judge found "the defendant acquiesced to their entry," Clerk's Papers (CP) at 23-24, and the Court of Appeals reported that "Schultz did not object." *State v. Schultz*, noted at 146 Wn. App. 1057, slip op. at 1, 2008 Wash. App. LEXIS 2277, at *2.

¶5 After entering the apartment, the officers separated Schultz and Robertson. Officer Malone spoke to Schultz inside the apartment while Officer Hill spoke to Robertson outside. About that time, Officer Malone noticed Schultz's neck was red and blotchy. Officer Malone asked Schultz whether anything physical had happened during the argument. Schultz denied anything had and told the officer her neck reddens when she becomes upset. Schultz also explained the argument started because she wanted Robertson

because it recalled the officers' testimony using that term. However, both officers testified that they heard loud talking, and Officer Hill specifically testified that he would not call it yelling. Schultz assigned error to this finding on appeal.

to change the locks on the door, but Robertson was instead sitting on the couch. During this time, Schultz was acting "fidgety" and picking things up around the house. Officer Malone asked Schultz to sit in a chair. Schultz complied but continued to fidget and grab at things. Officer Malone warned Schultz she would be handcuffed for officer safety if she did not sit still.

¶6 Outside, Robertson told Officer Hill there had been no physical violence and the argument had been about Robertson's failure to change the locks on the apartment door. The discussion outside took between 5 and 10 minutes before Robertson and Officer Hill returned inside to confer with Officer Malone.

¶7 Meanwhile, Schultz continued to pick up things off a nearby table, including a makeup bag. At that point, Officer Hill noticed a handgun and a marijuana pipe on the table. Officer Hill secured the weapon and unloaded it. He asked Schultz who the pipe belonged to, and Schultz said it belonged to her son who lived in Vermont. Officer Hill asked Schultz if he could search for more narcotics, and Schultz consented.

¶8 At that point, Schultz stood up and began picking things up off the table again. Officer Malone handcuffed Schultz to prevent her from grabbing anything but told Schultz that she was not under arrest. Schultz asked for her antianxiety medication. Officer Hill went with Robertson to go find the antianxiety medication. Robertson and Officer Hill talked while searching for the medication. Their talk led to Robertson's arrest for use of drug paraphernalia. Schultz then revoked her consent for a search. Officer Hill sought and received a search warrant by telephone. The officers searched the apartment and discovered methamphetamine. Schultz was charged.

¶9 Schultz sought to suppress the methamphetamine, arguing that the officers were not authorized to be in the apartment when they saw the evidence used to justify the search warrant. The trial court concluded that the officers were properly in the apartment on the ground that they

needed to talk to the occupants to ensure their safety. The trial court also concluded that "neither [Robertson nor Schultz] told [the officers] to leave and that [Schultz] initially acquiesced to their entry, stepping back and opening the door further, and at no time told or asked them to leave." CP at 23-24. The trial court denied Schultz's motion to suppress, and Schultz was convicted after a trial on stipulated facts. The Court of Appeals affirmed. *Schultz*, noted at 146 Wn. App. 1057. We granted Schultz's petition for review. *State v. Schultz*, 165 Wn.2d 1036, 205 P.3d 131 (2008).

## ANALYSIS

¶10 We generally review a trial court's denial of a motion to suppress for substantial evidence. *State v. Hill*, 123 Wn.2d 641, 644, 647, 870 P.2d 313 (1994). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *Id.* (citing *State v. Halstien*, 122 Wn.2d 109, 129, 857 P.2d 270 (1993)). We review the legal conclusions of the trial court de novo. *State v. Smith*, 165 Wn.2d 511, 516, 199 P.3d 386 (2009) (quoting *State v. Carneh*, 153 Wn.2d 274, 281, 103 P.3d 743 (2004)).

¶11 Schultz contends the officers' entry into her apartment violated article I, section 7 of the Washington Constitution, which provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Under our constitution, the home enjoys a special protection. " '[T]he closer officers come to intrusion into a dwelling, the greater the constitutional protection.' " *State v. Ferrier*, 136 Wn.2d 103, 112, 960 P.2d 927 (1998) (internal quotations marks omitted) (quoting *State v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994)).

¶12 The best source of "authority of law" is a warrant. *See State v. Day*, 161 Wn.2d 889, 893, 168 P.3d 1265 (2007); *Ferrier*, 136 Wn.2d at 115-19. "However, there are a few 'jealously and carefully drawn exceptions' to the

warrant requirement." *State v. Reichenbach*, 153 Wn.2d 126, 131, 101 P.3d 80 (2004) (internal quotations marks omitted) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70-71, 917 P.2d 563 (1996)). Protection from searches without authority of law may be waived by meaningful, informed consent. When the State asserts an exception authorizes its intrusion into private affairs, it bears the heavy burden of establishing that the exception applies. *State v. Johnston*, 107 Wn. App. 280, 284 n.11, 28 P.3d 775 (2001) (citing *State v. Parker*, 139 Wn.2d 486, 496, 987 P.2d 73 (1999)); *State v. Johnson*, 128 Wn.2d 431, 446-47, 909 P.2d 293 (1996).

EMERGENCY AID EXCEPTION

¶13 The State contends that entry was authorized under the emergency aid exception. This exception emerges from the police's "community caretaking function" and "allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance." *State v. Thompson*, 151 Wn.2d 793, 802, 92 P.3d 228 (2004) (citing *State v. Kinzy*, 141 Wn.2d 373, 386, 5 P.3d 668 (2000)). Under this court's cases, to justify intrusion under the emergency aid exception, the government must show that " '(1) the officer subjectively believed that someone likely needed assistance for health or safety concerns; (2) a reasonable person in the same situation would similarly believe that there was need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place being searched.' " *Kinzy*, 141 Wn.2d at 386-87 (quoting *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994)). The Court of Appeals has suggested three more factors: (4) there is an imminent threat of substantial injury to persons or property, (5) state agents must believe a specific person or persons or property is in need of immediate help for health or safety reasons, and (6) the claimed emergency is not a mere pretext for an evidentiary search. *State v. Leffler*, 142 Wn. App. 175, 181, 183, 178 P.3d 1042 (2007) (citing *State v. Lawson*, 135 Wn.

App. 430, 434, 144 P.3d 377 (2006) (specific persons and imminent threat); *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999) (pretext)). We agree.

## THE DOMESTIC VIOLENCE CONTEXT

 ¶14 We determine whether the police encountered an exigent circumstance permitting entry without a warrant on the specific facts presented. *State v. Raines*, 55 Wn. App. 459, 464, 778 P.2d 538 (1989) (citing *State v. Lynd*, 54 Wn. App. 18, 22, 771 P.2d 770 (1989)). Domestic violence presents unique challenges for law enforcement. Domestic violence situations can be volatile and quickly escalate into significant injury. Domestic violence often, if not usually, occurs within the privacy of a home. Our legislature has recognized that the risk of repeated and escalating acts of violence is greater in the domestic context. RCW 10.99.040(2)(a). The legislature has sought to provide "maximum protection" to victims of domestic violence through a policy of early intervention. RCW 10.99.010. The Court of Appeals has recognized that "[p]olice officers responding to a domestic violence report have a duty to ensure the present and continued safety and well-being of the occupants." *Raines*, 55 Wn. App. at 465.

 ¶15 This court has not yet specifically addressed the emergency aid exception to the warrant requirement in the context of domestic violence, but the Court of Appeals has. *See, e.g., State v. Johnson*, 104 Wn. App. 409, 16 P.3d 680 (2001) (emergency aid exception justified a warrantless entry after a report that a victim of domestic violence had locked herself in a bathroom, the defendant had a cut on his wrist and was slow to answer questions about location of the victim); *Menz*, 75 Wn. App. 351 (warrantless entry was justified after police received a phone call reporting domestic violence in progress; upon arrival officers observed that the door was ajar, the lights and television were on, and no one responded to knocks or announcements); *Raines*, 55 Wn. App. at 462 (warrantless

entry justified when householder stepped aside and allowed officers in when they asked if they could "'look around'"); *Lynd*, 54 Wn. App. 18 (warrantless entry was justified when a person called 911 and hung up, return calls met a busy signal, defendant admitted outside his home to assaulting the victim, the defendant was packing a car as if preparing to leave, and the defendant did not want the officer to look in the house). As these cases illustrate, the fact that police are responding to a situation that likely involves domestic violence may be an important factor in evaluating both the subjective belief of the officer that someone likely needs assistance and in assessing the reasonableness of the officer's belief that there is an imminent threat of injury. Domestic violence protection must also, of course, be consistent with the protection the state constitution has secured for the sanctity and privacy of the home. Wash. Const. art. I, § 7; *Ferrier*, 136 Wn.2d at 112 (citing *Young*, 123 Wn.2d at 185).

## Acquiescence as Waiver

¶16 Again, according to the officers' testimony, Officer Malone knocked on the apartment door and Schultz answered. Schultz initially denied anyone was there, and then Robertson appeared from the bedroom, Schultz stepped back, the door opened wider, and the officers walked inside. Schultz testified she stepped to the side because the officers were coming in. Under either version, it is uncontested that neither officer requested permission to enter or advised Schultz she could refuse a search. The trial court found only acquiescence; it did not find that Schultz consented to the entry. The Court of Appeals' description of the fact states that "Schultz did not object to Malone's presence." *Schultz*, slip op. at 1, 2008 Wash. App. LEXIS 2277, at *2.

¶17 Thus the police, the trial court, and the Court of Appeals seem to be of the view that the protections of article I, section 7 against warrantless intrusions into

private affairs and homes are easily waived by silent acquiescence. We disagree. Individuals do not waive this constitutional right by failing to object when the police storm into their homes.[2] Nor do they waive their rights when the police enter their homes without their consent just because they are too afraid or too dumbfounded by the brazenness of the action to speak up. The right not to be disturbed in one's home by the police without authority of law is the bedrock principle upon which our search and seizure jurisprudence is grounded. WASH. CONST. art. I, § 7; *Ferrier*, 136 Wn.2d at 112 (citing *Young*, 123 Wn.2d at 185).

¶18 The Fourth Amendment to the United States Constitution establishes the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This constitutional protection was, in part, in response to representatives of the King, with writs of assistance[3] and doubtlessly with muskets in hand, entering homes at will both in England and in the colonies. *See generally* THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 425-29 (7th ed. 1903); *Boyd v. United States*, 116 U.S. 616, 626 n.5, 6 S. Ct. 524, 29 L. Ed. 746 (1886) (citing 3 THOMAS ERSKINE MAY, THE CONSTITUTIONAL HISTORY OF ENGLAND SINCE THE ACCESSION OF GEORGE THIRD 1760-1860, ch. 11 (1863); HERBERT BROOM, CONSTITUTIONAL LAW 558 (George L. Denman ed., 2d ed. 1885); HOMERSHAM COX, INSTITUTIONS OF ENGLISH GOVERNMENT 437 (1863)), *abrogation recognized by Fisher v. United States*, 425 U.S. 391, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976). A century later the framers of

---

[2] We do not mean to suggest that Officers Malone or Hill stormed Schultz's apartment.

[3] Writs of assistance were a type of general warrant. They "received their name from the fact that they commanded all officers and subjects of the Crown to assist in their execution." NELSON B. LASSON, THE HISTORY AND DEVELOPMENT OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION 53-54 (1970). Once issued, they lasted for the life of the sovereign and the "discretion delegated to the official was therefore practically absolute and unlimited." *Id.* at 54. They allowed the bearer to search at will and open any package. *Id.* The Fourth Amendment reflects, among other things, our founders' abhorrence at such unwarranted intrusions. *See United States v. Leon*, 468 U.S. 897, 972, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (Brennan, J., dissenting) (citing TELFORD TAYLOR, TWO STUDIES IN CONSTITUTIONAL INTERPRETATION 41 (1969)).

the Washington Constitution were presented with a proposed state provision identical to the Fourth Amendment, and they rejected it in favor of the present article I, section 7 prohibiting the invasion of a home without authority of law. *See State v. Simpson*, 95 Wn.2d 170, 178, 622 P.2d 1199 (1980) (citing THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889 at 497 (Beverly Paulik Rosenow ed., 1962)). Article I, section 7 "differs from the Fourth Amendment in that it clearly recognizes an individual's right of privacy with no express limitations." *Simpson*, 95 Wn.2d at 178. "Article I, section 7, does not use the words 'reasonable' or 'unreasonable.' Instead, it requires 'authority of law' before the State may pry into the private affairs of individuals." *Day*, 161 Wn.2d at 896. These important constitutional protections cannot easily be brushed aside by representatives of the government. As with other constitutional rights, they are not necessarily absolute and may be waived but only by informed and meaningful consent. *Ferrier*, 136 Wn.2d at 115-19; *accord State v. Morse*, 156 Wn.2d 1, 4-5, 123 P.3d 832 (2005).

¶19 *Ferrier* is illustrative of limitations of state authority in the face of constitutional protections. There, officers had a tip of illegal activities but not sufficient grounds for a warrant. They decided to use a "knock and talk" procedure to attempt to obtain Ferrier's consent for a search. *Ferrier*, 136 Wn.2d 103. We concluded the procedure was inherently coercive to some degree.

> [T]he great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search.

*Id.* at 115. Accordingly, we held that when police officers conduct a "knock and talk" procedure to obtain consent to search a home, they must, prior to entry, inform the person

of the right to refuse or revoke consent. *Id.* at 118. Although the police in *Ferrier* said they had obtained consent, Ferrier, like Schultz, testified that the police just stepped into the house. *Id.* at 107-08. We later clarified that the *Ferrier* requirement was limited to situations where police request entry into a home to conduct a warrantless search. *State v. Khounvichai*, 149 Wn.2d 557, 563, 69 P.3d 862 (2003) (citing *State v. Williams*, 142 Wn.2d 17, 28, 11 P.3d 714 (2000)).

¶20 But neither *Williams* nor *Khounvichai* suggests that mere acquiescence is consent. That was not the question before the court in either case. Further, in *Khounvichai* police actually obtained consent, albeit without the better practice of the *Ferrier* warning, before entering the residence, and in *Williams* the police had an arrest warrant and obtained consent of a tenant before entering the residence. *Khounvichai*, 149 Wn.2d at 561; *Williams*, 142 Wn.2d at 20.

APPLICATION

¶21 With these principles in mind, we turn to the facts before us. The officers did not have a warrant. The State argues that the warrantless entry into Schultz's apartment was justified under the emergency aid exception. Under that exception, constitutionally protected privacy rights may be intruded upon when officers, among other things, subjectively and reasonably believe the requirements of emergency aid exception have been met. We agree with the court below that the likelihood that a situation involves domestic violence is an important consideration in evaluating the reasonableness of an officer's subjective belief that someone needs safety assistance. The State has the burden of establishing the facts justifying an exception to the rule that law enforcement officers are precluded from intruding upon the privacy of a person in their home. We hold that officers may not enter a home based upon acquiescence alone.[4] In the instant case, the State must establish that

---

[4] We respectfully disagree with our dissenting colleagues that the contrary holding below is dictum. As we noted long ago, "[i]t may be that the case could have

the police had a reasonable belief that all the elements of the emergency aid exception were satisfied before crossing the threshold of Schulz's apartment.

¶22 The facts most favorable to the State are as follows. The police received a phone call from a resident of an apartment complex about a yelling man and woman. The responding officers stood outside and overheard a man and woman talking loudly. The officers heard a man say that he wanted to be left alone and needed his space. The officers knocked on the door. Schultz opened it, appearing agitated and flustered. Officer Malone asked Schultz about the male occupant of the apartment. Schultz told her no one was there but, when confronted with the fact the officers heard voices, summoned Robertson from a nearby bedroom. When Robertson appeared, the officers entered Schultz's apartment based upon her acquiescence only. At the moment the officers crossed the threshold to Schultz's apartment, they did not have enough facts to justify an entry based upon the emergency aid exception to the warrant requirement.[5]

¶23 We have no reason to doubt the officers subjectively believed that entry was necessary or that they acted in good faith. But good faith is not enough to satisfy article I, section 7.[6] *State v. Afana*, 169 Wn.2d 169, 184, 233

---

been rested on the first ground suggested in the opinion . . . but both questions were clearly in the case, and simply because the court decided both, does not necessarily mean that the one or the other is dictum." *Savage v. Ash*, 86 Wash. 43, 46, 149 P. 325 (1915). In this case, the Court of Appeals made two holdings. Both need correction.

[5] The dissent is correct that we do not analyze all of the factors required to apply the emergency aid exception, as the failure to meet any factor is fatal to the lawfulness of the State's exercise of authority.

[6] Unlike the Fourth Amendment, the word "reasonable" does not appear in any form in the text of article I, section 7 of the Washington Constitution. We have long declined to create a "good faith" exception to the exclusionary rule cases in which warrantless searches were based on a reasonable belief by law enforcement officers that they were acting in conformity with one of the recognized exceptions to the warrant requirement. *Day*, 161 Wn.2d 889; *see also State v. White*, 97 Wn.2d 92, 110, 640 P.2d 1061 (1962). "[U]nlike the Fourth Amendment, article I, section 7 'focuses on the rights of individuals rather than on the reasonableness of the government action.'" *State v. Eisfeldt*, 163 Wn.2d 628, 639, 185 P.3d 580 (2008) (footnote omitted) (quoting *Morse*, 156 Wn.2d at 12).

P.3d 879 (2010). Some of the evidence relied upon by the State and courts below to justify the entry were obtained after the officers crossed the threshold to Schultz's residence. It was only after entering the apartment that Officer Malone noticed that Schultz's neck was red and blotchy. Similarly, if the officers could not have ascertained the location of the man whose voice they had heard, they would have been entitled to make further inquiries and perhaps enter the home to verify that he was safe. But Robertson appeared before the officers entered. Certainly other facts such as past police responses to the residence, reports of threats, or any other specific information to support a reasonable belief that domestic violence had occurred or was likely to occur, or that the circumstances were volatile and could likely escalate into domestic violence, may have justified entry. But upon the record before us, we conclude that the warrantless entry into Schultz's home and subsequent search violated her constitutionally protected right of privacy within her home. Her motion to suppress should have been granted.

## CONCLUSION

¶24 We recognize a few jealously guarded exceptions to the warrant requirement. State agents need no warrant to provide emergency aid. Courts may consider that an entry is made into a home in the context of a domestic violence threat in considering the reasonableness of officers' actions under the emergency aid exception. However, the State still has the burden of establishing facts to justify a warrantless search. The evidence that domestic violence was likely to occur in this case may be summarized as follows: (1) a report of a couple yelling, (2) the officers heard "raised voices" and a man say he wanted to be left alone and needed his space, (3) when Schultz answered the door she appeared agitated, and (4) she reported that no one was there before a man appeared from the bathroom. That is not enough. We reject the trial court's and the Court of Appeals' conclusion that Schultz consented by acquiescence because she failed

to object when the police walked into her apartment. The State has failed to establish an exception to the warrant requirement applies. The evidence that Schultz possessed illegal drugs was obtained without authority of law. Schultz was entitled to have her motion to suppress the evidence granted. We reverse the courts below and remand for any further proceedings consistent with this opinion.

C. JOHNSON, J.M. JOHNSON, and STEPHENS, JJ., and SANDERS, J. PRO TEM., concur.

¶25 FAIRHURST, J. (dissenting) — Because I believe the entry into Patricia Sue Schultz's apartment was justified under the emergency aid exception to the warrant requirement, I respectfully dissent. The emergency aid exception is derived from the "community caretaking function" of the police, which "allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance or when making routine checks on health and safety." *State v. Thompson*, 151 Wn.2d 793, 802, 92 P.3d 228 (2004). Both the rendering of emergency aid and a routine check on health and safety require police officers to render aid or assistance, but the emergency aid function in particular involves circumstances of greater urgency and searches resulting in a greater intrusion. *State v. Kinzy*, 141 Wn.2d 373, 386, 5 P.3d 668 (2000). The emergency aid exception to the warrant requirement may be invoked only when

"(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched."

*Id.* at 386-87 (quoting *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994)).

¶26 Both Schultz and the State agree that the application of the emergency aid exception is determined under

this three-part test. The State and Schultz disagree as to whether it was met here. Although not asked to by either party, the majority unnecessarily alters this three-part test and conflates the emergency aid exception with the issue of consent to a warrantless search.

¶27 The majority adopts three new "factors" to the exception and then proceeds to dismiss the emergency aid exception, apparently under one of the original elements without ever addressing these newly adopted factors. Majority at 754-55, 759-60. In addition to appearing to be dicta, the majority's new factors are unnecessary because they are subsumed in the original three-part test. For instance, whether the claimed emergency is "mere pretext for an evidentiary search" is subsumed in the requirement that the officers subjectively believe someone likely needs assistance for health or safety concerns. *Id.* at 754.

¶28 Limiting myself to the issues presented for review, I would hold, under the three original elements of the emergency aid exception, that the warrantless entry into Schultz's home was justified. First, the record reflects, and the majority concedes, that the police officers subjectively believed there was a likelihood someone needed help for health or safety concerns. *Id.* at 760. Moreover, the trial court concluded that there was no evidence the search was a pretext, and Schultz has not challenged this conclusion. Clerk's Papers (CP) at 23.

¶29 Second, I would find the officers' beliefs that there was a need for assistance were objectively reasonable. When we determine whether an officer's beliefs were objectively reasonable, we look "to the scene as it reasonably appeared to the officer at the time." *State v. Lynd,* 54 Wn. App. 18, 22, 771 P.2d 770 (1989). Courts should consider the totality of the circumstances when determining the reasonableness of a government intrusion. *State v. Acrey,* 148 Wn.2d 738, 753, 64 P.3d 594 (2003).

¶30 While I am not adopting a domestic violence exception, the dynamics of domestic violence are distinct from those of other crimes and are a part of the circumstances

the officer faces. The legislature has recognized "the importance of domestic violence as a serious crime against society" and legislatively has sought "to assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide." RCW 10.99.010. The legislature has also recognized that the risk of repeated acts of violence is greater in the domestic context. RCW 10.99.040(2)(a). We have recognized the general acceptance in the scientific community of the theory of battered person syndrome and the cycles of domestic violence. *State v. Allery*, 101 Wn.2d 591, 596-97, 682 P.2d 312 (1984). " '[V]ictims of domestic violence are sometimes uncooperative with police because they fear retribution from their abusers.' " *State v. Johnson*, 104 Wn. App. 409, 420, 16 P.3d 680 (2001) (quoting *State v. Jacobs*, 101 Wn. App. 80, 84, 2 P.3d 974 (2000)). "Police officers responding to a domestic violence report have a duty to ensure the present and continued safety and well-being of the occupants." *State v. Raines*, 55 Wn. App. 459, 465, 778 P.2d 538 (1989). The majority acknowledges the principle that police response to a situation likely involving domestic violence is an important factor to consider when determining the reasonableness of a police officer's belief that assistance is needed. Majority at 756. However, that principle appears to play little to no role in the majority's analysis.

¶31 Here, the officers were responding to reports of a possible domestic disturbance that was sufficiently raucous to concern a neighbor enough to call the police and report yelling and arguing. Upon their arrival, the officers heard the argument continuing in voices loud enough to be clearly heard through the apartment door. The officers specifically heard the man say that he wanted to be left alone and needed his space. When Schultz answered the door, the trial court found that she "was highly emotional, talking fast, flushed in the face, and she told Officer [Kori] Malone that she was upset." Reporter's Tr. of Proceedings on Appeal (Aug. 2, 2005) at 138. Additionally, the court found that

"[s]he appeared agitated, flustered and was not calm, [and] was clearly upset." *Id.*[7] When Officer Malone asked Schultz where the male occupant of the apartment was, Schultz denied that anyone else was in the apartment. In this context, Schultz's lie about Sam Robertson's presence would confirm an officer's fear that Schultz and Robertson were involved in a domestic violence emergency. Because Schultz and Robertson cohabitated, it was incumbent upon the officers to ensure that no violence had occurred or would occur after the officers' departure. Considering the totality of the circumstances, it was objectively reasonable for the officers to believe that Schultz or Robertson likely needed assistance.

¶32 The majority reduces the events of that day to four discrete facts and declares those facts to be insufficient for a reasonable person in the same situation to believe that there was a need for assistance. Majority at 761. When officers have obvious reasons to be concerned about a threat of domestic violence, "[c]ourts should be reluctant to rule after the fact that while there were reasons, they were not sufficient." *Raines*, 55 Wn. App. at 466. "Whether a police officer's acts in the face of a perceived emergency were objectively reasonable is a matter to be evaluated in relation to the scene as it reasonably appeared to the officer at the time, 'not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis.'" *Lynd*, 54 Wn. App. at 22 (quoting *State v. Bakke*, 44 Wn. App. 830, 837, 723 P.2d 534 (1986)). Based on the totality of these circumstances and the unique dynamics of domestic violence, I would hold Officer Michael Hill's and Officer Malone's entry into the home was objectively reasonable.

¶33 Turning to the final element of the emergency aid exception, I would hold there was a reasonable basis to associate the place searched with the need for assistance. Officers Malone and Hill wanted to separate Schultz and

---

[7] In the trial court's subsequent written findings of fact and conclusions of law, it found that "[Schultz] was highly emotional and agitated, talking quickly, was flushed and told the officer that she was upset." CP at 21.

Robertson before they interviewed them to determine if there was a continuing threat of violence. Officer Hill testified that the porch was too small for two people to stand without crowding each other. By keeping Schultz in the apartment and Robertson outside, the officers could minimize any influence between the two of them to ensure that both felt safe to talk to the police officers, and the police officers could compare the stories for consistency. Consequently, there was a reasonable basis to associate the place searched with the need for assistance.

¶34 Under the emergency aid exception, the officers were lawfully in the apartment when they saw the marijuana pipe. The marijuana pipe was properly before the court when the court issued the telephonic search warrant. Consequently, the methamphetamine discovered pursuant to that warrant was admissible against Schultz. On the issue of the emergency aid exception, I would affirm the Court of Appeals.

¶35 Because the emergency aid exception justified the warrantless entry, I decline to reach the alternate basis of consent suggested by the Court of Appeals and the State. However, the majority, holding that the emergency aid exception does not apply, addresses whether acquiescence amounts to consent under article I, section 7 of the Washington Constitution. Majority at 756-57. The majority reads into the trial court decision a conclusion of law that Schultz consented to the officers' entry, when the trial court reached no such holding. The trial court merely "noted" that occupants "acquiesced" to the officer's entry. CP at 23. This acknowledgment was part of the trial court's paragraph concluding that the officers' entry was not a pretextual search for evidence. *Id.*

¶36 Before the Court of Appeals, Schultz understandably did not raise the issue of consent in her opening brief. *See* Appellant's Opening Br. 1-16. The first briefing even remotely suggesting the issue of consent was made by the State in two short paragraphs inserted in its Court of Appeals argument regarding the applicability of the emer-

gency aid exception. Br. of Resp't at 7. The Court of Appeals stated that Schultz's acquiescence amounted to consent under case law relying on the Fourth Amendment to the United States Constitution. *State v. Schultz*, noted at 146 Wn. App. 1057, 2008 WL 4216255, at \*3, 2008 Wash. App. LEXIS 2277, at \*8. The Court of Appeals addressed consent as an alternative holding. Given its holding on the emergency aid exception, this was unnecessary and therefore dictum.

¶37 Although Schultz did not raise the issue of consent in her petition for review, the majority engages in an exploration into the issue of whether acquiescence amounts to consent for the purposes of article I, section 7 of the Washington Constitution. Even though neither party contends that the officers sought entry for the purpose of conducting a search, the majority spends significant effort discussing the knock-and-talk procedure in *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998). Majority at 758-59. As the majority notes, *Ferrier* has been limited to situations where police request entry into a home to conduct a warrantless search. *See State v. Khounvichai*, 149 Wn.2d 557, 563, 69 P.3d 862 (2003). The majority ultimately reaches the significant holding that under article I, section 7, "officers may not enter a home based upon acquiescence alone." Majority at 759. While we express no opinion regarding the majority's holding on the issue of consent, we are concerned with this court's willingness to draw a significant distinction between our constitution and the federal constitution on an issue not decided by the trial court, that was not raised in the petition for review, and that lacks proper briefing by the parties.

¶38 I would affirm the Court of Appeals and hold that the emergency aid exception justified the entry of Officers Hill and Malone into the home of Schultz and would uphold Schultz's conviction.

MADSEN, C.J., and ALEXANDER and OWENS, JJ., concur with FAIRHURST, J.

Reconsideration denied June 2, 2011.