

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | No. 68535-0-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ADREN DERAY COLEMAN, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 17, 2013 |

SCHINDLER, J. — A jury convicted Adren Deray Coleman of felony violation of a

no-contact order. Coleman seeks reversal, arguing the court erred in denying his

motion to suppress evidence. Because the unchallenged findings of fact support the

conclusion that the emergency aid exception justified warrantless entry, we affirm.

FACTS

Coleman does not challenge the trial court's findings of fact.[1] Coleman and Tara

Brown were engaged in a long-term off and on relationship, and are the parents of two

children.

In March 2010, Tara left Coleman and went to stay with her mother Patricia

Brown.[2] When Coleman threatened to "come over and shoot up the house," Tara filed

---

[1] Because Coleman does not challenge the findings of facts from the CrR 3.6 hearing, they are verities on appeal. State v. Hill, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

[2] We refer to some of the parties by their first names for purposes of clarity and mean no disrespect in doing so.

a petition for a no-contact order. The superior court issued a protection order.

In August, a coworker called the police after Coleman spit in Tara's face and pushed her "back in the car." Coleman pleaded guilty to a misdemeanor violation of a no-contact order, assault in the fourth degree, malicious mischief, and hit and run. At sentencing on December 17, the court issued a no-contact order prohibiting Coleman from contacting Tara or coming within 500 feet of her residence or workplace for two years. However, the order allows Coleman to contact Tara's mother Patricia Brown to arrange visitation with the children. In March 2011, Coleman contacted Tara. Coleman pleaded guilty to another misdemeanor protection order violation.

In June 2011, Tara and the children were living at the Arbor Chase Apartments. Tara's mother lived in an adjacent apartment complex, the Ventana Apartments. On Friday June 10, Tara got together with her friend Brittany Matthews to celebrate Tara's birthday. Brittany dropped Tara off at her apartment building at around noon the next day. Coleman's green Jaguar was parked in the Arbor Chase Apartments parking lot. Brittany called 911 after Coleman assaulted Tara by "pulling her into the apartment by her hair."

Kent Police Department Officer Roger Kellams, Officer Trevor Blake, and Officer Christopher Korus responded to the domestic violence assault at the Arbor Chase Apartments. Brittany flagged down the officers and was "visibly upset and distraught." Brittany told the officers that she and her close friend Tara had been out all night celebrating, and when she "dropped Tara off at her apartment," she saw Coleman physically assault Tara. Brittany told the officers she was concerned for Tara's safety because Coleman had "a history of assaulting and hurting Tara and that there was a no

contact order preventing Coleman from having contact with Tara." Brittany told the officers that right before they arrived, Coleman took Tara "to the adjacent apartment building, the Ventana Apartments, where Tara's mother lived." Brittany said that she was very "concern[ed] that Coleman would seriously hurt Tara" and that he was "really going to do something bad this time."

The officers went to the Ventana Apartments "to investigate the assault and to determine whether Tara had been injured" by Coleman. Brittany accompanied the officers and pointed out two apartments on the first floor where she thought Tara's mother lived. Officer Kellams heard male and female voices arguing but could not be sure which apartment. The officers entered the interior corridor of the building and knocked on the door of one of the two apartments identified by Brittany. The resident told the officers that Patricia Brown lived next door.

Before Officer Kellams and Officer Korus knocked on the apartment next door, Officer Blake went to the back of the apartment to make sure no one left through the back door. Officer Kellams then knocked on the apartment door and identified himself as a police officer. There was no response. After knocking again, Officer Kellams and Officer Korus heard footsteps.

After knocking a third time, a female tentatively asked, " 'Who is it?' " Officer Kellams said that "they were police officers and wanted to speak with Tara to make sure she was safe." When the woman did not respond, Officer Kellams knocked again and repeated "that they needed to make sure Tara was okay." There was no response.

The officers decided they "needed to enter the apartment to determine that Tara was not injured or being held against her will."

> [The officers] reasonably feared that Tara was in danger because they'd learned from [Brittany] that the defendant had previously assaulted Tara, that there was a no contact order in place, and that defendant Coleman was in the apartment with Tara. They also believed that Tara had been assaulted, based on the eye witness account of [Brittany]. But they did not know if she had suffered injuries as a result of the assault or the extent of her injuries. For those reasons, Officer Kellams and [Officer] Korus believed it necessary to actually see the alleged victim to see if she needed medical attention.

The officers thought it would not take long to get a key from the building manager, "and that this approach was more reasonable than [them] damaging the door by forcing entry." The officers "felt it was not wise to leave the scene or to wait longer than a few minutes . . . due to the potential danger to Tara."

After approximately 10 to 15 minutes, the manager arrived with a key to the apartment. Officer Kellams and Officer Korus entered the apartment and immediately found Tara. "Tara appeared as if she had been crying or was about to cry, her lower lip trembled, and she spoke in a soft, apprehensive voice. She did not appear injured."

Initially, Tara told the officers that Coleman had "gone out the back window." After telling Tara that Officer Blake was stationed at the back of the apartment, Tara admitted Coleman was upstairs. Tara's mother and the two children were also in the apartment. Tara agreed to ask Coleman to come down. Eventually, Coleman came downstairs. The officers arrested Coleman for violation of the no-contact order.

The State charged Coleman with felony violation of a court order in violation of RCW 26.50.110. The information alleged that on June 11, 2011, Coleman willfully violated the terms of the no-contact order issued on December 17, 2010 under chapter

4

10.99 RCW. The State also alleged Coleman had "at least two prior convictions for violating the provisions of" a no-contact order issued under chapter 10.99 RCW and chapter 26.50 RCW.

Coleman filed a motion to suppress all evidence from the warrantless entry into Patricia Brown's apartment. Coleman asserted he had standing to challenge the warrantless search. Coleman argued that the emergency aid exception did not apply because the State could not show imminent threat of harm or immediate need for assistance. Coleman argued that waiting for 10 to 15 minutes to get a key to enter the apartment showed the officers did not believe Tara faced an imminent threat or was in immediate need of help. The defense also argued the officers should have obtained a warrant.

The State claimed Coleman did not have standing because he did not have a privacy interest in the apartment. But the State argued that even if Coleman had standing, the emergency aid exception justified the warrantless entry into the apartment.

Officer Blake, Officer Kellams, and Officer Korus testified at the CrR 3.6 hearing. Officer Blake testified that Brittany told the officers that "there had been physical altercations in the past [between Coleman and Tara.] She explained multiple times, that she was afraid [Coleman] was really going to do something bad this time."

Officer Kellams and Officer Korus had a lot of experience in responding to domestic violence and described the volatility of domestic violence cases. Officer Kellams testified that domestic violence calls "are volatile kinds of calls. There's a lot of interactions . . . that take place, and you never know if someone is truly in need until you see them face-to-face."

5

Officer Kellams testified that he was concerned Coleman was preventing Tara from opening the door and they did not have time to get a warrant.

> A.    Basically, I think the need to make sure that Tara Brown was okay made it more important to go in at the time. I don't think we could have backed off for four hours and used manpower to seal the apartment and obtain a search warrant to go in and resolve that situation. I don't think we had that much time. I don't think we could allow that much time to go on and not resolve whether Tara Brown was okay or not.
>
> Q.    In the time it would take to get a warrant, would you, as an officer and detective, been concerned that Tara Brown was apprehensive for her safety?
>
> A.    She was -- in my opinion she was, yes.

Officer Korus testified that he wanted to check on Tara because he "[d]idn't know what the extent of her injuries were, if anything. Didn't know -- she could have still been getting assaulted." Officer Korus said, "[I]f somebody's reported they're being assaulted then we need to physically check on them. We can't just knock on the door and leave in the hopes that they're okay. . . . They could be injured." Officer Korus also testified that it "could take hours to get a warrant. And, again, we need to check on her right now. [W]e can't just go away and come back later and hope that they're okay." Officer Korus explained that "if you can contact a manager and the manager says, 'Yes. I'll be there with a key in a few minutes.' That's reasonable, you know. We'll wait a few minutes."

The court denied the motion to suppress. The court ruled that Coleman did not have standing to challenge the search. However, even if Coleman had standing, the court ruled that the emergency aid exception to the warrant requirement justified the search.

> If I were to find that [Coleman] did have standing, I would, however, also find that the emergency aid exception warranted the entry into the apartment without a warrant. And I particularly rely on the language in State v. Schultz, 170 Wn.2d 746[, 248 P.3d 484 (2011)], in which the

6

Supreme Court has acknowledged that domestic violence situations can be volatile and quickly escalate into significant injury and there is a need to give maximum protection to victims of domestic violence. And it goes on to say that police officers responding to a domestic violence report have a duty to insure the present and continued safety and well-being of the occupants.

I do conclude that the police subjectively believed that Ms. Tara Brown was in need of assistance for her health and safety based on reports that they had from [Brittany] of a history of prior violence by the defendant, the presence of a no-contact order, and [an] eyewitness account of an assault that occurred not that much before the police had arrived. In addition, they heard arguing coming from some part of the apartment complex. They confirmed that a female was in the apartment because she spoke to them through the door, and the female would not respond to their inquiries of her well-being.

The court entered detailed findings of fact and conclusions of law, and incorporated its oral ruling.

During the two-day jury trial, Brittany, Officer Kellams, Officer Blake, Tara, Patricia Brown, and Detective Angela Galetti testified.

Detective Galetti testified that Coleman had two prior convictions for violating a no-contact order, and that the no-contact order issued December 17, 2010 prohibited Coleman from contacting Tara and from coming within 500 feet of her residence or workplace.

The jury found Coleman guilty of domestic violence felony violation of a no-contact order. The court sentenced Coleman as a first-time offender, imposed 90 days confinement on work release, and ordered him to complete domestic violence treatment. The court also entered a no-contact order.

## ANALYSIS

Coleman seeks reversal of his conviction for domestic violence felony violation of a no-contact order. Coleman contends the court erred in concluding the emergency aid

exception to the warrant requirement justified the warrantless entry and search of the apartment.

We review a trial court's decision on a motion to suppress to determine whether the findings are supported by substantial evidence and whether those findings, in turn, support the conclusions of law. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). We defer to the trier of fact on "issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Because Coleman does not challenge the findings of fact, we treat those findings as verities on appeal. O'Neill, 148 Wn.2d at 571. We review conclusions of law de novo. State v. Johnson, 128 Wn.2d 431, 443, 909 P.2d 293 (1996).

The Fourth Amendment of the United States Constitution and article I, section 7 of the Washington State Constitution prohibit an unreasonable search and seizure. State v. Williams, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984). Under the Washington State Constitution, "the home enjoys a special protection." Schultz, 170 Wn.2d at 753.

Subject to " 'jealously and carefully drawn' " exceptions, a warrantless search is unreasonable. State v. Hendrickson, 129 Wn.2d 61, 72, 917 P.2d 563 (1996) (quoting State v. Bradley, 105 Wn.2d 898, 902, 719 P.2d 546 (1986)). The emergency aid exception to the warrant requirement " 'allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance.' " Schultz, 170 Wn.2d at 754 (quoting State v. Thompson, 151 Wn.2d 793, 802, 92 P.3d 228 (2004)).

8

The State has the burden of establishing the facts justifying the emergency aid exception to the warrant requirement. Schultz, 170 Wn.2d at 759. The determination of whether the emergency aid exception justifies a warrantless entry is based on the facts of each case. Schultz, 170 Wn.2d at 755. The Court in Schultz recognized the unique challenges police officers face when responding to a domestic violence situation. Schultz, 170 Wn.2d at 755.

> Domestic violence presents unique challenges for law enforcement. Domestic violence situations can be volatile and quickly escalate into significant injury. Domestic violence often, if not usually, occurs within the privacy of a home. Our legislature has recognized that the risk of repeated and escalating acts of violence is greater in the domestic context. RCW 10.99.040(2)(a). The legislature has sought to provide "maximum protection" to victims of domestic violence through a policy of early intervention. RCW 10.99.010. The Court of Appeals has recognized that "[p]olice officers responding to a domestic violence report have a duty to ensure the present and continued safety and well-being of the occupants."

Schultz, 170 Wn.2d at 755 (quoting State v. Raines, 55 Wn. App. 459, 465, 778 P.2d 538 (1989)).

To establish the emergency aid exception, the State must show (1) the police officer subjectively believed that someone likely needed assistance for health or safety concerns, (2) a reasonable person in the same situation would similarly believe that there was need for assistance, (3) there was a reasonable basis to associate the need for assistance with the place being searched, (4) there is an imminent threat of substantial injury to persons or property, (5) state agents must believe a specific person or persons or property are in need of immediate help for health or safety reasons, and (6) the claimed emergency is not a mere pretext for an evidentiary search. Schultz, 170 Wn.2d at 754. All six factors must be met in order for the emergency aid exception to

9

apply, and "the failure to meet any factor is fatal to the lawfulness of the State's exercise of authority." Schultz, 170 Wn.2d at 760 n.5.

The Court expressly identified domestic violence as an important consideration in evaluating factor (4), the reasonableness of the officer's belief that there is an imminent threat of substantial injury; and factor (5), the officer's subjective belief that a person is in need of assistance.

> [T]he fact that police are responding to a situation that likely involves domestic violence may be an important factor in evaluating both the subjective belief of the officer that someone likely needs assistance and in assessing the reasonableness of the officer's belief that there is an imminent threat of injury.

Schultz, 170 Wn.2d at 756.

Coleman asserts that because the trial court did not address whether there was an imminent threat of injury to Tara or that she was in need of immediate help, the emergency aid exception did not justify the warrantless search.[3] While the trial court did not explicitly address factors (4) and (5), the unchallenged findings of fact and the record support the conclusion that the officers believed there was an imminent threat of substantial injury to Tara, and that Tara was in immediate need of help for her health or safety.

The police responded to a 911 call reporting a domestic violence assault. When the police arrived, Brittany told the officers that she saw Coleman assault Tara moments before, and saw them leave and go to the apartment building where Tara's mother lived.

---

[3] Coleman does not argue the remaining four factors are not met, and those four factors are clearly supported by the unchallenged findings. The unchallenged findings of fact establish that the officers subjectively and reasonably believed that an emergency existed: "Officers determined that they needed to enter the apartment to determine that Tara was not injured or being held against her will." The findings also establish the police officers "reasonably feared that Tara was in danger" and "believed it necessary to actually see the alleged victim to see if she needed medical attention." Based on the information from Brittany, the officers reasonably believed Tara and Coleman were in Patricia's apartment, and there is no suggestion that the officers' entry was pretextual.

Brittany also told the officers that Coleman had a "history of assaulting and hurting Tara," that there was a no-contact order in place, and she was very concerned Coleman was going to "seriously hurt Tara." Based on the unchallenged findings of fact, the court concluded the officers reasonably believed there was an imminent threat of substantial injury to Tara and had a subjective belief Tara was in need of immediate help for health and safety reasons.

> In this case, the police officers responding to this 911 call subjectively believed that Tara was in need of assistance to ensure her safety because [Brittany] reported to them that she had witnessed defendant Coleman assault Tara, that defendant Coleman had assaulted Tara in the past, and that there was a no contact order that prevented Coleman from contacting Tara. Officers had confirmed that a female was in the apartment and could get no response to their inquiries about her well-being after she had asked who was at the front door. At least one officer believed to have heard a man and woman arguing inside this apartment. Based on [Brittany's] report, they also believed that the man inside the apartment was defendant Coleman. A reasonable person in this situation would have believed, as these officers did, that they must check on the safety of Tara. Officers also had a reasonable basis to believe that the apartment was the place to be searched given the information from [Brittany] and their observations. None of this was a pretext for a search given the information from [Brittany] and the officers' observations.

Nonetheless, Coleman contends the evidence did not establish there was an imminent threat of injury or an immediate need for help because the officers waited approximately 10 to 15 minutes for the manager to bring them the key to the apartment. But the unchallenged findings show that despite the delay, there was an imminent risk of injury and the officers believed Tara was in need of immediate help for safety reasons. Officer Kellams testified that based on what Brittany told the officers, they were very concerned for Tara's safety and believed she may have been seriously injured. Officer Kellams said that they went to the apartment to check "Tara Brown's safety" and "needed to determine if she was okay or not." Officer Kellams testified that

11

they had to "make every effort to contact" a domestic violence victim. Officer Kellams said that they asked "the management to bring a key to the apartment" and while they thought it would be "quick," it took 10 to 15 minutes "before a manager came with a key." Officer Kellams testified that while they waited for the key, the officers were still concerned that Coleman was preventing Tara from opening the door. We conclude the unchallenged findings and record establish the requirements of the emergency aid exception, including factors (4) and (5).

Because the emergency aid exception justified the warrantless search, we affirm.[4]

WE CONCUR:

---

[4] Accordingly, we need not address Coleman's claim of ineffective assistance of counsel. Further, in a statement of additional authorities, Coleman cites State v. Tibbles, 169 Wn.2d 364, 371-72, 236 P.3d 885 (2010), and State v. Hinshaw, 149 Wn. App. 747, 756, 205 P.3d 178 (2009), for the proposition that the State must establish obtaining a warrant was impracticable. Coleman cannot raise a new argument for the first time in a statement of additional authorities. RAP 10.8; Frank v. Fischer, 108 Wn.2d 468, 476, 739 P.2d 1145 (1987). In his brief on appeal, Coleman does not argue that the State had not met its burden of proving that obtaining a warrant was impracticable. In any event, the record does not support his argument.

12