# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,  )
        )  No. 70730-2-I
      Respondent,  )
        )  DIVISION ONE
    v.  )
        )  UNPUBLISHED OPINION
MICHAEL AARON D'ANGELO,  )
        )  FILED: November 3, 2014
      Appellant.  )

TRICKEY, J. — Michael D'Angelo appeals the trial court's decision denying his motion to suppress evidence of an illegal drug found on him after police officers entered his apartment without a warrant. The trial court concluded that the police officers were justified in entering D'Angelo's apartment under the emergency aid exception to warrantless searches. D'Angelo contends that the emergency aid exception did not justify the officers' warrantless intrusion because the State failed to prove two of the six criteria set forth in State v. Schultz, 170 Wn.2d 746, 248 P.3d 484 (2001). However, the undisputed findings and the record both demonstrate that these factors were met. We affirm.

## FACTS

In the early hours of February 14, 2013, Bellevue Police Officers Amanda Jensen and Dirk Graham responded to unit 3 of an apartment complex after a neighbor residing in unit 2 called 911.[1] The 911 caller reported that she heard a female voice in unit 3 coughing, crying, and loudly saying, "Let me go."[2] When Officers Jensen and Graham

---

[1] Report of Proceedings (RP) at 11-13, 30, 46-48.
[2] RP at 11-12.

arrived, they listened outside the door of unit 3 for a while, but did not hear anything.[3] The officers then contacted the 911 caller, who reiterated what she had previously reported and stated that she was concerned for the female in the neighboring apartment.[4] The officers returned to unit 3 and knocked on the door repeatedly.[5] Again, no one answered.[6] Officer Jensen testified that she was concerned because she believed someone was still inside the apartment and could be in danger or injured.[7]

The officers eventually heard a man inside the apartment—later identified as D'Angelo—yelling at them, telling them to leave the premises, and insisting that the officers would not enter without a warrant.[8] D'Angelo sounded agitated and aggressive.[9] Officer Jensen announced themselves as police officers and informed D'Angelo that they needed to enter and check on the welfare of the people inside.[10]

At some point, Officer Jensen could hear a female voice whining, whimpering, and crying.[11] The female voice was later identified as Raquel Walsh.[12] The officers then heard Walsh request that D'Angelo open the door.[13] D'Angelo, however, continued to direct Walsh to refrain from opening the door.[14] Finally, Walsh opened the door slightly ajar.[15] The officers were only able to view part of her face.[16] Officer

---

[3] RP at 13, 48.
[4] RP at 13, 48.
[5] RP at 13, 48.
[6] RP at 13, 48.
[7] RP at 14, 26.
[8] RP at 13, 49.
[9] RP at 15.
[10] RP at 14.
[11] RP at 16.
[12] RP at 50.
[13] RP at 16-17.
[14] RP at 17.
[15] RP at 17.
[16] RP at 17.

Jensen pushed the door open to allow her to see inside the apartment.[17] Officer Jensen saw Walsh and D'Angelo standing just inside the threshold of the door.[18] Although Walsh did not appear injured, she looked upset and fearful.[19]

Officer Graham then asked D'Angelo to step out of the apartment so the officers could separate him and Walsh.[20] The officers were still standing outside the apartment at this point and were unable to determine whether additional people were inside the apartment or if there were weapons involved.[21] Officer Jensen believed Walsh needed help and was concerned that D'Angelo was unwilling to cooperate.[22]

D'Angelo refused to step outside the apartment to speak to Officer Graham and began to back into the apartment and shut the door.[23] When Officer Graham noticed D'Angelo reach into his pockets, the officers entered the apartment and seized D'Angelo in an effort to prevent him from closing the door.[24] D'Angelo ended up pulling the officers back into the apartment.[25] After arresting D'Angelo, Officer Graham searched him and discovered oxycodone in his pocket.[26]

The State charged D'Angelo with one count of possession of oxycodone, in violation of the Uniform Controlled Substances Act, chapter 69.50 RCW.[27] D'Angelo subsequently brought a motion to suppress the evidence of oxycodone pursuant to CrR

---

[17] RP at 17-18.
[18] RP at 17.
[19] RP at 34.
[20] RP at 17, 51.
[21] RP at 18.
[22] RP at 17-18.
[23] RP at 18.
[24] RP at 19, 52-53.
[25] RP at 19.
[26] RP at 58.
[27] Clerk's Papers (CP) at 1.

3.6.[28] Officer Jensen, Officer Graham, and Walsh testified at the suppression hearing.[29]

The trial court denied D'Angelo's motion to suppress, ruling that the officers' entry into D'Angelo's apartment was justified under the emergency aid exception to the warrant requirement.[30] The trial court concluded, in part, that "it was reasonable for officers to enter the residence to ensure that the parties were safe."[31]

D'Angelo waived his right to a jury trial and requested a bench trial on stipulated facts.[32] The trial court found him guilty as charged.[33]

D'Angelo appeals.

## ANALYSIS

D'Angelo contends that the trial court applied an erroneous and incomplete legal standard when concluding that the emergency exception justified a warrantless search. In so contending, he argues that the trial court failed to "substantively" apply all of the six factors required under State v. Schultz, 170 Wn.2d 746, 248 P.3d 484 (2011), for the emergency aid exception to apply.[34] We disagree. Although the trial court did not explicitly address two of the factors articulated in Schultz, the record and unchallenged findings of facts establish that these factors were met. Accordingly, we affirm.

We review a trial court's decision on a CrR 3.6 suppression motion to determine whether substantial evidence supports the court's findings of facts and whether those findings, in turn, support the court's conclusions of law. State v. Cole, 122 Wn. App. 319, 322-23, 93 P.3d 209 (2004). Because D'Angelo does not challenge the findings of

---

[28] CP at 6.
[29] RP at 6, 44, 71.
[30] CP at 31-37.
[31] CP at 35.
[32] CP at 19-22.
[33] CP at 23-30.
[34] Br. of Appellant at 6.

fact from the CrR 3.6 hearing, they are verities on appeal. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We review conclusions of law de novo. Cole, 122 Wn. App. at 323.

The Fourth Amendment of the United States Constitution and article I, section 7 of the Washington State Constitution prohibit an unreasonable search and seizure. State v. Williams, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984). Under the Washington State Constitution, "the home enjoys a special protection." Schultz, 170 Wn.2d at 753. Despite these protections against warrantless searches, "'there are a few jealously and carefully drawn exceptions to the warrant requirement.'" Schultz, 170 Wn.2d at 753-54 (internal quotation marks omitted) (quoting State v. Reichenbach, 153 Wn.2d 126, 131, 101 P.3d 80 (2004)). The emergency aid exception to the warrant requirement is one exception. See Schultz, 170 Wn.2d at 753-54. It "'allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance.'" Schultz, 170 Wn.2d at 754 (quoting State v. Thompson, 151 Wn.2d 793, 802, 92 P.3d 228 (2004)).

The State has the burden of establishing the facts justifying the emergency aid exception to the warrant requirement. Schultz, 170 Wn.2d at 759. The determination of whether the emergency aid exception justifies a warrantless entry is based on the facts of each case. Schultz, 170 Wn.2d at 755.

In Schultz, a case on which D'Angelo principally relies, the Washington Supreme Court discussed the then-established factors required to prove the emergency aid exception. 170 Wn.2d at 754. These factors are

"(1) the [police] officer subjectively believed that someone likely needed assistance for health or safety concerns; (2) a reasonable person in the

5

same situation would similarly believe that there was need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place being searched."

Schultz, 170 Wn.2d at 754 (internal quotation marks omitted) (quoting State v. Kinzy, 141 Wn.2d 373, 386-87, 5 P.3d 668 (2000)). The Supreme Court adopted three additional factors gleaned from the Court of Appeals case law:

(4) there is an imminent threat of substantial injury to persons or property, (5) state agents must believe a specific person or persons or property is in need of immediate help for health or safety reasons, and (6) the claimed emergency is not a mere pretext for an evidentiary search.

Schultz, 170 Wn.2d at 754, 760. All six factors must be met in order for the emergency aid exception to apply. Schultz, 170 Wn.2d at 760 n.5.

Furthermore, the Schultz court recognized the unique challenges police officers face when responding to a domestic violence situation:

Domestic violence presents unique challenges for law enforcement. Domestic violence situations can be volatile and quickly escalate into significant injury. Domestic violence often, if not usually, occurs within the privacy of a home. Our legislature has recognized that the risk of repeated and escalating acts of violence is greater in the domestic context. RCW 10.99.040(2)(a). The legislature has sought to provide "maximum protection" to victims of domestic violence through a policy of early intervention. RCW 10.99.010.

170 Wn.2d at 755. The court continued to state that a survey of cases indicates that

the fact that police are responding to a situation that likely involves domestic violence may be an important factor in evaluating both the subjective belief of the officer that someone likely needs assistance and in assessing the reasonableness of the officer's belief that there is an imminent threat of injury.

Schultz, 170 Wn.2d at 756.

D'Angelo contends that the State failed to meet its burden of proving that Walsh faced an imminent threat of substantial injury (Schultz factor four) and that the officers

believed that Walsh was in need of immediate help for health or safety reasons (Schultz factor five). In support of his argument, D'Angelo attempts to analogize the facts in this case to those in Schultz. In Schultz, police officers received a telephone report from a resident of an apartment complex who had called "about a yelling man and female." 170 Wn.2d at 750. When the officers arrived at the apartment, they stood outside and heard a man and woman talking with raised voices inside. Schultz, 170 Wn.2d at 750. The officers heard a man state that he wanted to be left alone and needed his space. Schultz, 170 Wn.2d at 750-51. According to the officers' version of events, Patricia Sue Schultz answered the door when the officers knocked on the door, appearing agitated and flustered. Schultz, 170 Wn.2d at 751. She denied anyone else was inside. Schultz, 170 Wn.2d at 751. One of the officers told Schultz that she had heard a male voice inside. Schultz, 170 Wn.2d at 751. Schultz called for Sam Robertson, who then appeared from a nearby room. Schultz, 170 Wn.2d at 751. Schultz stepped back and opened the door wide, and one of the officers followed her inside. Schultz, 170 Wn.2d at 751.

Applying the law to the facts, the Schultz court concluded that the warrantless entry and subsequent search were unlawful and that the motion to suppress was erroneously denied. 170 Wn.2d at 761. The court emphasized that the facts favorable to the State were insufficient to conclude that exigent circumstances existed. Schultz, 170 Wn.2d at 760. At the moment the officers crossed the threshold they did not have enough facts to justify an entry on the grounds of the emergency aid exception. Schultz, 170 Wn.2d at 760. The court added that "[c]ertainly other facts such as past police responses to the residence, reports of threats, or any other specific information to

7

support a reasonable belief that domestic violence had occurred or was likely to occur, or that the circumstances were volatile and could likely escalate into domestic violence, may have justified entry." Schultz, 170 Wn.2d at 761.

The circumstances that were absent in Schultz are present in this case. Here, D'Angelo's neighbor heard a woman in distress who was shouting, "[L]et me go."[35] The officers contacted the 911 caller to confirm the reliability of her call after they heard no sounds from inside D'Angelo's apartment. Unlike in Schultz, here, the officers initially heard no sounds coming from the apartment, increasing their concern that the woman inside could be in danger or injured if they did not intervene. And where Schultz appeared agitated and flustered, here, Walsh appeared frightened and upset, while D'Angelo continued to behave aggressively and in an agitated manner. Moreover, the officers' limited view of the apartment and its occupants was not sufficient to mollify their concern about Walsh's safety.

In all, D'Angelo's aggressive behavior throughout the confrontation, in conjunction with Walsh's fearful demeanor and crying, denoted a volatile situation that could escalate at any moment. See Schultz, 170 Wn.2d at 761. Thus, the officers were justified in entering the apartment to ensure that D'Angelo posed no present or continuing threat to Walsh. We conclude that the officers reasonably believed that a situation involving domestic violence was occurring or would occur in the near future and that immediate intervention was necessary to deal with the imminent threat of substantial injury to Walsh.

---

[35] RP at 11-12.

In both its oral ruling and written decision, the trial court did not address factors four and five of Schultz.[36] D'Angelo contends that the court's failure to do so mandates reversal of his conviction.[37] But although the trial court did not explicitly address Schultz factors four and five, the unchallenged facts and the record support the conclusion that the officers believed there was an imminent threat of substantial injury to Walsh and that Walsh was in immediate need of help for her health and safety.

Affirmed.

Trickey, J

WE CONCUR:

Leach, J.

Becker, J.

---

[36] RP at 139-147; CP at 35-37.
[37] D'Angelo appears to argue that the standard of review for applying an incorrect or incomplete legal standard is for abuse of discretion. This is not the correct standard of review used by courts when reviewing CrR 3.6 decisions. Rather, as noted above, this court reviews conclusions of law de novo.