**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| STATE OF WASHINGTON, | No.  48489-7-II |
| Respondent, | |
| v. | PUBLISHED OPINION |
| MICHAEL RAY HORN, | |
| Appellant. | |

BJORGEN, J. — Michael Ray Horn appeals his conviction of domestic violence felony harassment, arguing that his constitutional right to present a defense was violated.  He also contends that the imposition of mandatory deoxyribonucleic acid (DNA) collection and crime victim penalty assessment (VPA) fees violated his substantive due process rights, and he requests that appellate costs be waived.  Finally, he raises additional claims in a statement of additional grounds (SAG).

We hold that (1) Horn's right to present a defense was not violated, (2) the mandatory imposition of DNA and VPA fees did not violate his substantive due process rights, (3) under RAP 14.2, Horn may challenge costs on appeal before our court commissioner if the State requests them and he objects to them, and (4) Horn's SAG claims fail.  Accordingly, we affirm.

FACTS

Horn and Suzy Oubre became romantically involved while Oubre was estranged from another man with whom she had had a relationship.  Horn and Oubre began openly dating in January 2015.

In January 2015, Horn and Oubre were at Oubre's residence drinking alcoholic beverages.  While Oubre was using her cellphone, Horn grew angry and accused her of texting

the man with whom she had been involved. According to Oubre, she had never seen him have "an episode like this before." Report of Proceedings (RP) at 141. Horn grabbed Oubre's night shirt and ripped it open, hitting her on the chest in the process.

Scared that the downstairs neighbor would hear the scuffle, Oubre and Horn went to Horn's home. Once they arrived and got out of the car, Oubre told Horn that she was going to leave, but Horn grabbed her. They began wrestling when Horn pushed her against a wall and down into a flower bed. He bit her multiple times. Oubre did not call the police. After this incident, when Horn would drink too much and get aggressive, she would refer to that facet of Horn's personality as "Bo-Bo." RP at 151. When "Bo-Bo" came out, Oubre was scared for her life.

On August 7, 2015, Oubre texted Horn that she could no longer "worry about him" and that she had a fear of "Bo-Bo." RP at 196-97. Horn later brought wine and dinner to her house. After dinner, Oubre was on her bed in the master bedroom playing a cellphone game when Horn asked who she was texting. Like the January incident, Horn became angry and accused her of texting the individual with whom she had been involved.

Oubre told Horn that their relationship was "not going to work." RP at 205. In response, Horn ripped off Oubre's bra and told her she was not going anywhere. After Oubre struck Horn in the chest a couple of times, Horn punched her in the eye, knocking her across the bedroom floor. Horn demanded that Oubre retrieve her cellphone so that he could see the text messages. Oubre, who was now scared, complied and gave her cellphone to him.

As Horn was looking through the text messages, Oubre tried to push past Horn and leave the master bathroom. Horn blocked her path to the door, and pushed, punched, and kicked her. Eventually, Oubre asked Horn if she could lie down on the bed and have some ice for her eye

2

injury, but he told her that she was not "going to need to worry about [her] eye." RP at 213. He said that he had thought "about this a long time, and you and I are going to die tonight." RP at 213. Oubre believed him.

Horn retrieved Oubre's gun from under the mattress, and then straddled her, cocked the gun, and put it in his mouth. He asked her how she "was going to feel when he blew his brains out on the ceiling." RP at 216. Horn subsequently took the gun out of his mouth and pointed it at Oubre's head. He told her that she was "going to go to heaven or hell tonight, whichever one [she] deserve[s]." RP at 218-19. As Horn locked the door to the master bedroom, he repeatedly said that they were both going to die. Oubre believed Horn and felt like her life was going to end that night. Oubre got up and tried to leave, but Horn stopped her by pushing her onto the floor and by punching and kicking her. Eventually, Oubre was able to coax Horn to lay down and fall sleep.

While Horn was asleep, Oubre left and went to the hospital where her extensive injuries were treated. She spoke with the police while at the hospital, and Horn was then arrested.

Among other offenses, Horn was charged with domestic violence felony harassment based on the August incident. Horn posted bail on August 20, 2015. Oubre and Horn got engaged on September 5 and took a trip together. Horn was later charged with violating a no-contact order,[1] to which he pled guilty in district court. As part of the events related to that charge, videotape evidence showed Horn naked while jumping on top of Oubre's car.

Before trial on the felony harassment charge, the State sought to introduce evidence of the January 2015 incident under ER 404(b) to show that Horn's threat to kill Oubre in August

---

[1] Although the record does not make this clear, it appears that Oubre was the protected party in this no-contact order.

2015 placed her in reasonable fear that the threat would be carried out. One of the elements of felony harassment is that the victim be placed in reasonable fear that a threat will be carried out. RCW 9A.46.020(1)(a)(i), (b), (2)(b)(ii).

The defense objected and in the alternative argued that if the State was permitted to introduce this evidence, the defense should be able to introduce evidence of Oubre and Horn's engagement and trip after August 2015. In the defense's view, this evidence showed that Oubre did not have a reasonable fear that Horn would carry out his threat to kill her on August 7.

The State opposed the admission of evidence of their engagement and trip because "it triggers a bunch of things," including Horn's later violation of a no-contact order where he was naked and jumping on top of Oubre's vehicle. RP at 72. The State also did not believe the evidence was relevant to whether Oubre was fearful in August, stating:

> The subsequent knowledge does not address the fear on the day of the crime. You can't retroactively apply that fear. The fear has to be at that time, what the victim knew at that point in time.

RP at 73. The defense responded that without this evidence, the jury is left

> with the false impression that Mr. Horn is this horrible abuser, and they can't even hear about the fact that even though this allegedly happened, she's going off with him . . ., knowing there's a protective order, having a good time.

RP at 75.

The trial court first determined that evidence related to the January incident would be admitted because it would "help the jury to determine whether [Oubre] had . . . a reasonable fear or not." RP at 79. However, it declined the defense's request to admit the evidence of the engagement and vacation, stating:

> I understand where [the defense] is coming from. . . . [I]f we're to ascertain or determine what her fear was on August 7th, what happened afterwards informs the jury to a certain extent of how fearful she was on August 7th. . . .

4

And I think but-for the complications and the muddying of waters that occurs with charges in another court, . . . I think I would be inclined to allow some of that information, if it was close in time of the assault. Because I think that does inform whether her fear was reasonable, you know, like a day or two afterwards. . . .

[H]ere we're talking he was out [on bail] by August 20th, they were engaged by September 5th, so we're talking a month later. At that point I'm concerned because people do things to protect themselves.

An alleged victim very well may say the best way I can protect myself is when he's kind of on the ropes when the police are after him and he's facing charges. Maybe now is a good time. I, quote-unquote, . . . can't get rid of him now, but maybe if I can keep him at bay by placating him.

I don't know what's going on in a person's mind, but I think if I were to allow open what happened subsequent, especially a month, month and a half later, that muddies the water too much. And if I were to allow that, then I think the State would have an opportunity to say, look, you violated the no-contact order violation, and that goes to her fear.

. . . .

[I]f we didn't have the complications of the muddied waters, of the violation of a no-contact order, allegations of climbing naked, entering into the home without permission, I think that goes too far afield, and I think that would confuse the jury as to the issues, and I think it actually could shed a very negative light on Mr. Horn, maybe even worse than allowing the January event, so that's my rationale.

RP at 80-83.

During trial, Oubre, Horn, and the police officers testified. Horn's statements given in an interview with police immediately after the August 7 incident were admitted into evidence. In that interview, he told the interviewing officer that he drank alcohol, "blacked out," and did not remember what happened that night. RP at 558. When he testified in his own defense, Horn stated that he drank, and he did not remember the night of the August 7 incident because he "blacked out." RP at 598-99, 602-03, 611.

5

The jury found Horn guilty of two counts of fourth degree assault, unlawful possession of a firearm, and domestic violence felony harassment. At sentencing, the court imposed mandatory DNA collection and VPA fees. Horn appeals.

## ANALYSIS

### I. RIGHT TO PRESENT DEFENSE

Horn argues that his Sixth Amendment right to present his defense was violated because the trial court did not admit evidence of Oubre and Horn's engagement and trip taken after the August 7 incident. For the reasons below, we hold that Horn fails to show a Sixth Amendment violation.

### A.      Standard of Review

We review a Sixth Amendment right to present a defense claim under a three-step test. First, the evidence that a defendant desires to introduce "'must be of at least minimal relevance.'" *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). A defendant only has a right to present evidence that is relevant. *Id.*; ER 401. Second, if relevant, the burden shifts to the State to show that the relevant evidence "'is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" *Jones*, 168 Wn.2d at 720 (quoting *Darden*, 145 Wn.2d at 622). Third, the State's interest in excluding prejudicial evidence must also be balanced against the defendant's need for the information sought, and relevant information can be withheld only if the State's interest outweighs the defendant's need. *Id.* The same test is used to review claims that the right to confront witnesses was violated. *State v. Lee*, 188 Wn.2d 473, 488, 396 P.3d 316 (2017).

We review constitutional issues de novo. *State v. Armstrong*, 188 Wn.2d 333, 339, 394 P.3d 373 (2017). Consistently with that principle, our Supreme Court has held that we review de

6

novo a defendant's claim that his Sixth Amendment right to present a defense was violated. *Jones*, 168 Wn.2d at 719. On the other hand, we generally review a trial court's evidentiary rulings for an abuse of discretion. *State v. Strizheus*, 163 Wn. App. 820, 829, 262 P.3d 100 (2011). For example, in *Lee*, 188 Wn.2d at 486-88, our Supreme Court held that we review for an abuse of discretion a trial court's ruling limiting cross-examination of a witness that implicated the defendant's constitutional right of confrontation. In *Darden*, 145 Wn.2d at 619, our Supreme Court, in a confrontation clause challenge, also held that a trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion.

To preserve the rule in *Jones* that we review a Sixth Amendment right to present a defense claim de novo, some element of the three-step *Jones* test must be reviewed de novo. The first prong of the *Jones* test, the inquiry into minimal relevance, *see Jones*, 168 Wn.2d at 720, is the one most directly involving the admission of evidence and most directly demanding ample breathing room for the trial court. Therefore, to preserve both our de novo review of constitutional claims and the review of evidentiary rulings for an abuse of discretion, we review the first prong of the test above, whether the evidence of Oubre and Horn's engagement and trip is minimally relevant, for an abuse of discretion. To ensure de novo review of the Sixth Amendment claim itself, the second and third prongs of the test would be reviewed de novo. This approach preserves each standard of review in a way fitting the type of determination under review.

This approach also tracks the Supreme Court's rulings in *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017), which held:

> We review the trial court's evidentiary rulings for abuse of discretion and defer to those rulings unless "'no reasonable person would take the view adopted by the trial court.'" *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001) (internal quotation marks omitted) (quoting *State v. Ellis*, 136 Wn.2d 498, 504, 963

P.2d 843 (1998)).  If the court excluded relevant defense evidence, we determine as a matter of law whether the exclusion violated the constitutional right to present a defense.  *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

As in *Clark*, we review the first step of the *Jones* test, whether the excluded evidence was minimally relevant, for an abuse of discretion.  Consistently with *Clark*, if the first step is met, we would review the remaining two steps de novo.

The concurrence in this case would first determine whether the trial court abused its discretion in excluding the evidence at issue and then examine the constitutional claim de novo. Here, the trial court excluded evidence of the engagement and trip out of an apparent concern that it was irrelevant and confusing.  Adding a preliminary step to the *Jones* test to review that decision under abuse of discretion would be superfluous, since minimal relevance is already reviewed under the first prong of that test.  The most economical method of proceeding is to recognize, as the majority opinion does, that minimal relevance is reviewed for abuse of discretion under the first prong of *Jones*.

An abuse of discretion is present only if there is a clear showing that the exercise of discretion was manifestly unreasonable, based on untenable grounds, or based on untenable reasons.  *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).  A decision is based on untenable grounds or made for untenable reasons if it rests on facts unsupported in the record or was reached by applying the wrong legal standard.  *Id.*  A decision is manifestly unreasonable if it falls outside the range of acceptable choices, given the facts and the applicable legal standard. *Id.*

B.    The Trial Court Did Not Deprive Horn of His Right to Present a Defense

A defendant is guilty of felony harassment if without lawful authority, the person (1) knowingly threatens to kill an individual and (2) his words or conduct places the threatened

individual in reasonable fear that the threat to kill will be carried out. RCW 9A.46.020(1)(a)(i), (b), (2)(b)(ii); *State v. C.G.*, 150 Wn.2d 604, 612, 80 P.3d 594 (2003).

To show a violation of the right to present a defense, the excluded evidence, that of Horn and Oubre's engagement and trip, must first be of at least minimal relevance. *Jones*, 168 Wn.2d at 720. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The threshold to admit relevant evidence is very low. *Darden*, 145 Wn.2d at 621. Impeachment evidence is relevant if: (1) it tends to cast doubt on the credibility of the person being impeached and (2) the credibility of the person being impeached is a fact of consequence to the action. *State v. Allen S.*, 98 Wn. App. 452, 459-60, 989 P.2d 1222 (1999).

Oubre testified that she feared that Horn would carry out his threat to kill her during the August 7 incident. Her testimony provided evidence to support an essential element of Horn's felony harassment conviction. Oubre's subsequent engagement and trip with Horn thus would be relevant, if at all, to impeach her testimony that she feared Horn at the time he threatened to kill her.

Turning to the first of the requirements for impeachment evidence above, Horn was released on bail on August 20, and he and Oubre were engaged on September 5. The charged felony harassment occurred on August 7. With the frightening nature of the threats and violence against Oubre on August 7 and the passage of nearly a month until their engagement, Oubre's change of heart casts little doubt on her testimony that on August 7, in the face of repeated violence and death threats, she feared for her life.

More importantly, we note that expert testimony on the battered person syndrome is admissible in Washington, *State v. Allery*, 101 Wn.2d 591, 597, 682 P.2d 312 (1984), and that an element of that syndrome is a recognition of the cycles of domestic violence.[2] Specifically, *Allery* recognized the presence of temporary lulls in the physical abuse inflicted on the battered partner, in which "she forgives her assailant, hoping that the abuse will not reoccur." 101 Wn.2d at 597. More recently, in a dissent, now Chief Justice Fairhurst of our Supreme Court characterized *Allery* as recognizing "the general acceptance in the scientific community of the theory of battered person syndrome and the cycles of domestic violence." *State v. Schultz*, 170 Wn.2d 746, 764, 248 P.3d 484 (2011) (Fairhurst, dissenting). In *Schultz*, the majority did not question the battered person syndrome or the presence of cycles of violence, but held that under the circumstances the possibility of domestic violence did not justify a warrantless entry into a dwelling. 170 Wn.2d at 750.

For these reasons, especially the judicial recognition of the cycles of violence and reconciliation in relationships involving domestic violence, the evidence of Oubre's engagement to and trip with Horn was not minimally relevant. The trial court's exclusion of that evidence was neither manifestly unreasonable, based on untenable grounds, nor based on untenable reasons. Thus, under the abuse of discretion standard, the exclusion of this evidence did not deprive Horn of his right to present a defense under the first prong of the *Jones* test. Because Horn does not meet the first requirement of the three step test in *Jones*, 168 Wn.2d at 720, his claim that the trial court deprived him of the right to present a defense fails.

---

[2] We express no opinion as to whether such evidence must be from an expert.

## II. MANDATORY LEGAL FINANCIAL OBLIGATIONS

Horn argues that the mandatory DNA collection and VPA fees are unconstitutional as applied to defendants who do not have the ability, or the likely ability, to pay them. In *State v. Seward*, 196 Wn. App. 579, 584-86, 384 P.3d 620 (2016),[3] *review denied*, 188 Wn.2d 1015 (2017), we rejected this argument and held that the DNA collection and VPA fees are rationally related to legitimate state interests and therefore do not violate a defendant's right to substantive due process. Under *Seward*, we uphold the imposition of these fees on Horn.

## III. SAG

Horn's first SAG claim is not an argument, but a question: "I want to know if my speedy trial rights were violated?" SAG at 1. This generalized question is not particularized enough to permit appellate review. We are "not obligated to search [the] record in support of claims made in [the SAG]." RAP 10.10(c); *State v. Thompson*, 169 Wn. App. 436, 493 n.195, 290 P.3d 996 (2012). Although Horn questions whether his speedy trial rights might have been violated, we cannot assume the role of an advocate and comb the record to determine whether he has a meritorious speedy trial right claim. Therefore, we decline to address this claim any further.

Horn's second SAG claim states that he "was not allowed to complete [his] mental health evaluation for . . . [(post-traumatic stress disorder)] PTSD." SAG at 1. Assuming this to be true, Horn fails to articulate how this prejudiced his trial. The record shows that his defense counsel elicited evidence regarding his PTSD, and his PTSD diagnosis was brought out during closing argument. For these reasons, this claim fails.

Horn's final SAG claim is that he "didn't have any witnesses! I had 0—the State had 18." SAG at 1. First, Horn did have a witness testify in his defense—himself. To the extent he

---

[3] (Bjorgen, C.J., dissenting).

is arguing that he received ineffective assistance of counsel[4] because his attorney failed to call more witnesses, nothing in the appellate record indicates that Horn had any other favorable witnesses that would have testified on his behalf. If Horn believes otherwise, he should supplement the record and make this claim in a personal restraint petition. *See State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

For these reasons, Horn's SAG claims fail.

IV. APPELLATE COSTS

Horn asks that we exercise our discretion to deny any appellate costs the State requests. Under RAP 14.2, a commissioner of this court will determine whether to award appellate costs if the State decides to file a cost bill and if Horn objects to that cost bill.

CONCLUSION

Horn's right to present a defense was not violated, and his other claims fail. Therefore, we affirm his conviction.

Bjorgen, P.J.

I concur:

Sutton, J.

---

[4] *Strickland v. Washington*, 466 U.S. 668, 669-70, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

MELNICK, J. (concurring) — I agree with the majority's opinion that the trial court did not abuse its discretion in excluding evidence relating to the engagement and vacation. However, I disagree with the majority equating a review for "minimal relevance" with the "abuse of discretion" standard of review. *See* Majority at 6-9; *see also* ER 401, ER 402, ER 403. I think the minimal relevance test[5] should only be utilized when an appellate court determines the trial court abused its discretion in excluding evidence and it then examines the constitutional claim de novo. Rather than using the majority's analysis, I instead believe that the correct analytical framework is contained in *State v. Blair*, No. 50037-0-II (Wash. Ct. App. Apr. 24, 2018).

As *Blair* states, when a defendant alleges a violation of the right to trial or confrontation based on the trial court's exclusion of evidence, the standard of review is abuse of discretion. If there is no abuse of discretion, there is no error, and the inquiry ends. If the trial court does abuse its discretion, then we take the next step and review de novo the claim that a constitutional right has been violated.

Because neither the majority nor I concludes the trial court abused its discretion in excluding the challenged evidence, I concur with the majority result to affirm.

_____
Melnick, J.

---

[5] *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).