**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| STATE OF WASHINGTON, | No.  50879-6-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| CLIFFORD JAMES COLLIER, | |
| Appellant. | |

GLASGOW, J. — A no contact order prohibited Clifford James Collier from contacting his former girlfriend, Christina Manley, and their disabled daughter.  Nevertheless, Collier spoke with Manley by phone where a friend of Manley's could hear and record the conversations. During these conversations, Collier made multiple specific threats to harm Manley.  Collier now appeals his resulting convictions for two counts of telephone harassment, but not his conviction for violation of a protective order.

Collier argues that the trial court erred when it admitted evidence of other crimes, wrongs, or acts against the victim.  In addition, he claims the trial court violated his constitutional right to present a defense when the court admitted evidence of his daughter's medical conditions but refused to admit evidence of her death, which the superior court concluded was irrelevant.  He also claims that the State presented insufficient evidence to convict him of felony telephone harassment because he denied placing the calls and Manley testified at trial that she did not take the threats seriously.  Finally, he asserts that cumulative error denied him a fair trial.

We affirm Collier's convictions.

No. 50879-6-II

FACTS

In 2015, Collier pleaded guilty to felony harassment against his former girlfriend and mother of his two children, Christina Manley. In that incident, Collier threatened to kill Manley and their daughter, S.C.,[1] who had cerebral palsy and epilepsy. The trial court in that case entered a five year no contact order that prohibited contact between Collier and Manley and also entered a five year no contact order between Collier and S.C. The no contact orders did not prohibit Collier from having contact with the couple's younger son.

About 15 months after entry of the no contact orders, between October 5 and 7, 2016, Collier spoke on the phone with Manley, her friend Elizabeth Jones, and Elizabeth's mother, Bobbie Jones.[2] In one phone conversation between Manley and Collier that occurred on speakerphone, Bobbie and Elizabeth heard Collier make multiple specific threats of harm against Manley and her two children.

On October 5 and 6, 2016, Manley and Bobbie each recorded part of conversations with Collier. Manley was on the line during both of these calls. In one call, Collier threatened to kill the children and in the other, he threatened to kill Manley. Manley took Collier seriously enough that she fled with S.C. to another county and checked into a hotel under a different name. She ultimately went to the police station with Bobbie and Elizabeth to report the threatening phone calls.

_____

[1] Collier and Manley's daughter is referred to in the record in varying ways: S-.D, S.-DC, S.L.C., and S.D.C. We refer to the daughter as S.C.

[2] We refer to Elizabeth Jones and Bobbie Jones by their first names for clarity.

2

Bobbie told the police that Collier said he was going to kill Manley because she was not allowing him to see S.C. Collier talked about stabbing Manley in the neck, looking for a gun, and killing Manley if she tried to take their kids away. Bobbie played a voicemail that she alleged she received from Collier for Officer Michael Merrill. A male voice directed his message to Bobbie and Manley. He said that he was going to die with their son. Merrill kept copies of the voicemail and audio recordings from Manley and Bobbie, and then had Manley, Bobbie, and Elizabeth all complete handwritten statements.

The State charged Collier with four criminal domestic violence offenses. The State amended the charges twice. The final charges included one count of felony harassment premised on his threats to kill Manley, two counts of telephone harassment, and one count of violation of a protection order. The State designated each count as a domestic violence incident under RCW 10.99.020.

A.      Pretrial Motions in Limine

1. Evidence of Collier's Other Crimes Under ER 404(b)

During pretrial motions, the State moved to admit evidence of Collier's criminal history under ER 404(b). The State argued that Collier's criminal history was relevant to Manley's state of mind—her "reasonable fear"—an essential element of felony harassment. Clerk's Papers (CP) at 36. The State also argued that Collier's prior conviction for felony harassment was necessary to establish the predicate offense in the alternative charges, including violation of a no contact order.

Collier argued that admitting his criminal history would be prejudicial because the jury's consideration of Manley's "reasonable fear" in this case should not be "tainted by a prior

3

conviction" for similar conduct in a prior case. 3 Verbatim Report of Proceedings (VRP) at 37-38. The trial court ruled, stating that "when I balance the probative value of the evidence against the unfair prejudicial effect, I find that it is probative." 3 VRP at 38.

2. Evidence of S.C.'s Medical Condition and Subsequent Death

S.C. died prior to trial. The State moved to exclude evidence of S.C.'s medical condition and subsequent death. The State argued that these facts were irrelevant to whether Collier had made threats to kill her mother because Collier raised no defense that made S.C.'s medical condition and death relevant and because Collier's concerns for S.C.'s wellbeing could not justify the alleged threats.

Collier responded that he had called Child Protective Services on several occasions to report that Manley was not taking proper care of S.C. and that S.C.'s medical condition was relevant to Collier's concern for her safety and his resulting state of mind at the time. The trial court denied the motion to exclude evidence of S.C.'s medical condition, but granted the motion to exclude the fact that she had since died.

B. Trial

By the time the jury trial began, Manley had become uncooperative, so the trial court granted the State's motion for a material witness warrant. The police arrested Manley and brought her to court.

The State called four witnesses: Manley, Merrill, Bobbie, and Elizabeth. The State also introduced three exhibits, including the audio recordings of Collier's threats, as well as certified copies of the two orders prohibiting contact between Collier and Manley, and Collier and S.C.

4

On direct examination, the State asked Manley: "At any point during that period of time [October 5-7], was he seeking to have contact with her [S.C.]? Was he asking to see her?" 4 VRP at 208. Manley replied: "Yes. That's what it's all about." 4 VRP at 208. She confirmed that she contacted the police and provided them with a written statement. She largely confirmed that Collier had made the threats against her and S.C. The prosecutor had Manley read the threats she wrote in her written statement:

A. I will bury you in the ground and I will kill you.

. . . .

A. I'm looking for a gun. I will kill – kill you because I don't want to have to knife you to death. The streets told me I should.

4 VRP at 212. Manley did not remember receiving a call from Collier while staying with Bobbie and Elizabeth. However, she did testify:

Q. So you remember telling Officer Merrill from the Lakewood Police Department – he was the officer you gave the handwritten statement to.

A. Okay.

Q. Do you remember telling him that during this period of time that the defendant told you that if you didn't let him see your daughter that he would find you and kill you both?

A. Yes.

Q. Any of the conversations that you had with Mr. Collier, did you record those?

A. Yeah.

Q. Okay. Was there a reason that you felt it was necessary to record *these specific calls from the defendant*?

A. No. I just wanted to show him that he looked like an idiot.

> Q. But you also provided copies of these recordings to the Lakewood Police Department, did you not?
>
> A. I did.

4 VRP at 215 (emphasis added). When the prosecutor referred to the calls from the defendant, Manley did not interject to say that she had, in fact, placed the calls. Nor did defense counsel object to this line of questioning based on facts not in evidence or for any other reason.

Manley confirmed there were "two phone calls recorded." 4 VRP at 225. The trial court admitted the audio recordings of the calls into evidence.

On one recording dated October 5, 2016, Collier, Manley, and Bobbie were on the call. The jury heard Collier say, in part, "I will do what I have to do to protect my kids. And at the end, yes, I will bury her. And motherf***in' I'm killing my kids at the same time because I feel foster care and all that would be better than what she's doing to them." Ex. 1, Audio of Phone Calls, Oct. 5, 2016 at 1 hour, 25 min. to 1 hour, 38 min.

The jury also heard Collier say in the second recording dated October 6, 2016:

> Christina, it's really like that. I'm gonna attempt to kill you today straight up if you do not give her to me. I took it to the streets and everybody's with it. I'm looking for a burner to f***ing shoot you instead of trying to knife you. Because right now, I'm going to protect my daughter.

Ex. 1, Audio of Phone Calls, Oct. 6, 2016 at 56 min. to 1 hour 12 minutes. Only Collier and Manley can be heard on this call.

Manley testified that she did not take the threats seriously, and Collier's threats did not concern her. She testified: "I know it's part of Clifford's disability, so I know that he's not going to. He'll say things, but he's not going to." 4 VRP at 217. The prosecutor then asked:

6

Q  So despite the fact that the defendant told you specifically he's looking for a gun, if that doesn't work, he'll knife you to death, he'll bury both you and your daughter under the ground – the specificity of those threats did not cause you alarm or fear?

A  No, because I know Clifford will say anything he needs to say to be able to have his daughter.  That's what this is all about.  He's willing to do anything to have his daughter.

. . . .

Q  Okay.  So you call the police, but you didn't take the threats seriously; correct?

A  No.  One thousand percent do not believe that Cliff would harm me in any form or shape.

4 VRP at 217-18.  On cross-examination, Manley testified:  "Cliff would not harm anyone.  Cliff doesn't make me fear for my life."  4 VRP at 225.

Merrill testified that it is "[v]ery common" for victims of domestic violence to recant their prior statements.  4 VRP at 240-41.  Merrill also testified that when Manley was at the station, "[s]he appeared to be frightened, very concerned about the welfare of her [son] who was in the custody of Mr. Collier."  4 VRP at 252.

Merrill further testified that he listened to at least two recordings:  one recorded by Bobbie and one recorded by Manley.  He said that Manley identified Collier as the male voice on the audio recordings.  He also confirmed that, on the audio recordings, Collier said he "was going to shoot her, and if that didn't work, he was going to stab her and bury her."  4 VRP at 251.

Bobbie testified that she heard Collier make threats against Manley and their kids over the phone while Manley was talking with Collier on speakerphone in the car.  Elizabeth was also present and was listening.  Bobbie did not say who had placed the call, Collier or Manley.  She

7

testified that "[Collier] talked about stabbing Christina in the neck. He talked about looking—riding around, looking for a gun, and he talked about that he wanted [S.C.]." 4 VRP at 260. She testified that Collier sounded "[l]ike he was at wit's end." 4 VRP at 262. The prosecutor asked Bobbie if it appeared that Manley was taking the threat seriously and she replied: "Yes, she took it serious." 4 VRP at 264. Bobbie testified that Collier made two additional calls to her on October 5 and 6 and threatened to kill Manley if she tried to take his kids away.

Elizabeth testified that on October 5, 2016, "he [Collier] called" her mom, Bobbie. 4 VRP at 272-73. Elizabeth testified that Collier "mentioned cutting [Manley's] throat and getting rid of the kids" on the phone call. 4 VRP at 273. Elizabeth did not indicate that Manley was with them at the time they received this call from Collier.

Collier testified but did not call any other witnesses. Collier explained that he had contacted Child Protective Services because he was concerned about S.C.'s care in light of her medical condition.

Collier acknowledged that he had pleaded guilty to felony harassment of Manley in 2015. He confirmed that he had two no contact orders in place. He also confirmed that he threatened to kill Manley. He did so, he said, "[b]ecause I believed that she was not taking the proper steps to take care of my daughter and do what she needed to be doing for her." 4 VRP at 288. Collier also confirmed that he threatened Manley because he wanted to see his daughter.

Collier testified that that Bobbie called him with Manley on the line. He said he did not intend to hurt Manley or follow through with his threats to kill her, but "[i]t was my intent to get her attention." 4 VRP at 289-92.

8

C.    Verdict and Sentence

During deliberations, the jury asked: "Does the [l]aw mandate that the [d]efendant initiated the call?" CP at 71. The court answered that the jury should refer to their instructions. Instruction 10 provided,

> A person commits the crime of telephone harassment when, with intent to harass, intimidate, or torment another, he or she initiates a telephone call threatening to inflict injury on the person called or on any member of his or her family or household and the threat was a threat to kill the person called or any other person.

CP at 97.

The jury found Collier not guilty of felony harassment but found him guilty of telephone harassment as charged in counts 2 and 3. The jury also found him guilty of violation of a no contact order as charged in count 4. By special interrogatory, the jury found Collier, Manley, and their children to be members of the same family or household, relating to the domestic violence designation on each count.

Collier appeals his two convictions for telephone harassment, but not his conviction for violation of the no contact order.

ANALYSIS

I. EVIDENCE OF COLLIER'S PRIOR CONVICTION FOR FELONY HARASSMENT

The trial court admitted evidence of Collier's prior harassment conviction under ER 404(b). Collier argues that the trial court erred when it did so, thereby denying him a fair trial. We disagree.

ER 404(b) prohibits a trial court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." For

9

a trial court to admit evidence of other crimes under ER 404(b), our Supreme Court has held that

the trial court must:

> "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the [permissible] purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

*State v. Arredondo*, 188 Wn.2d 244, 257, 394 P.3d 348 (2017) (quoting *State v. Gresham*, 173

Wn.2d 405, 421, 269 P.3d 207 (2012)).  "This analysis must be conducted on the record, and if

the evidence is admitted, a limiting instruction is required." *Arredondo*, 188 Wn.2d at 257.  We

review each prong of the test for an abuse of discretion. *Id.*

Collier does not dispute that his prior harassment conviction occurred or that the trial

court identified a permissible purpose for the admission of his prior conviction, namely, it tended

to prove reasonable fear.  Accordingly, we need not otherwise address prongs one and two.

Turning to the third prong, the trial court had to determine whether the evidence was

relevant to prove an element of the crime charged. *Id.*  "Relevant evidence means evidence

having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the

evidence." ER 401 (internal quotation marks omitted).  The State argued that the evidence of

Collier's prior conviction was relevant to prove Manley's state of mind or reasonable fear and

Collier's violation of the no contact order. Collier did not contest that the evidence was relevant,

but instead argued that it would be unduly prejudicial.

The State bore the burden of proving every element of felony harassment, including the

element of "reasonable fear." *State v. Magers*, 164 Wn.2d 174, 183, 189 P.3d 126 (2008).  In

*Magers*, our Supreme Court recognized that a prior conviction of a crime against the current

victim was clearly admissible to prove the victim's reasonable fear. *Id.* at 181-82. The *Magers* court also concluded that it was "entirely appropriate" to put on evidence regarding entry of the no contact order that the defendant allegedly violated. *Id.*

Here, the State moved to admit evidence of Manley's "reasonable fear," which included Collier's prior guilty plea for felony harassment against Manley in 2015. CP at 2. The State also charged Collier with violating the 2015 no contact order and, therefore, it was appropriate for the State to present the order that arose from his prior conduct. *See Magers*, 164 Wn.2d at 181-82.

Collier relies on Manley's testimony that she was certain that Collier would not harm her. He claims that in light of her testimony, his prior harassment conviction does not make it more or less probable that his threats made in October 2016 placed Manley in reasonable fear.

Nevertheless, Manley's trial testimony does not render the trial court's exercise of discretion to admit his prior convictions for the purpose of addressing "reasonable fear" manifestly unreasonable or untenable. 3 VRP at 38. Objectively, Collier's prior felony harassment of Manley directly bears on the question of her "reasonable fear," despite her later recantation. Others testified to the fear she exhibited shortly after receiving Collier's threats, and his prior conviction had a tendency to make a fearful reaction more probable than it would be absent the prior conviction. We conclude that Manley's trial testimony did not undermine the admission of the prior conviction or establish an abuse of discretion.

Under the fourth prong, the trial court must weigh the probative value of the proffered evidence against its prejudicial effect. *Arredondo*, 188 Wn.2d at 257. On this prong, the trial court concluded that "when I balance the probative value of the evidence against the unfair prejudicial effect, I find that it is probative." 3 VRP at 38. We agree that there is no question

that Collier's prior guilty plea for felony harassment against Manley has a prejudicial effect, but that effect is outweighed by its probative value, especially in light of her conflicting testimony.

Finally, the trial court provided a limiting jury instruction to mitigate prejudice that stated: "You may have heard evidence concerning alleged misconduct by the defendant on dates other than that of the charged incidents. Such evidence may only be considered by you to the extent you find it relevant to the issue of whether Christina Manley had reasonable fear." CP at 93; *see Arredondo*, 188 Wn.2d at 264. Absent evidence to the contrary, we presume the jury followed the trial court's instructions. *State v. Dye*, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013).

In sum, we hold the trial court did not abuse its discretion when it admitted evidence of Collier's prior conviction under ER 404(b).

## II. CONSTITUTIONAL RIGHTS TO PRESENT A DEFENSE AND FREE SPEECH

Collier argues that by excluding evidence of his daughter's death, the trial court violated his constitutional right to present a defense. Specifically, he claims that testimony concerning S.C.'s death was relevant because it had a tendency to show that his statements to Manley were not "true threats," but rather attempts to convince Manley to take better care of S.C. Reply Br. of Appellant at 5. We disagree.

A.     Right to Present a Defense

Criminal defendants have a constitutional right to present a defense. U.S. CONST., amends. V, VI, XIV; WASH. CONST. art. I, §§ 3, 22; *e.g.*, *State v. Jones*, 168 Wn.2d 713, 719-20, 230 P.3d 576 (2010). In *Jones*, our Supreme Court reiterated its analysis for determining whether the exclusion of evidence violates a defendant's constitutional right to present a defense. *Id.* The evidence that a defendant desires to introduce "'must be of at least minimal relevance'"

because a defendant has no right to present irrelevant evidence. *Id.* at 720 (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)); *see also State v. Lee*, 188 Wn.2d 473, 479-80, 487-93, 396 P.3d 316 (2017) (starting with a determination of whether the excluded evidence was at least minimally relevant); *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017) (considering first whether the trial court had excluded relevant defense evidence).[3] A defendant must at least make some plausible showing of how the evidence he wants to present would have been both material and favorable to his defense. *State v. Gonzalez*, 110 Wn.2d 738, 750, 757 P.2d 925 (1988).

If the evidence is relevant, the burden shifts to the State to show that the relevant evidence "'is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" *Jones*, 168 Wn.2d at 720 (quoting *Darden*, 145 Wn.2d at 622). "The State's interest in excluding prejudicial evidence must also 'be balanced against the defendant's need for the information sought,' and relevant information can be withheld only 'if the State's interest outweighs the defendant's need.'" *Id.* at 720 (quoting *Darden*, 145 Wn.2d at 622). Where evidence is highly probative, it is less likely that it can validly be excluded without violating the constitutional right. *Jones*, 168 Wn.2d at 720-21.

This appeal also involves the overlay of another constitutional right, free speech. *See State v. Tellez*, 141 Wn. App. 479, 482, 170 P.3d 75 (2007). Under the First Amendment, the State can only criminalize "true threats." *Id.* "The existence of a true threat . . . is not an

---

[3] *See also State v. Blair*, 3 Wn. App. 2d 343, 350-52, 415 P.3d 1232 (2018); *State v. Horn*, 3 Wn. App. 2d 302, 310, 415 P.3d 1225 (2018). Each of these cases offers a slightly different framework for analyzing whether a defendant was deprived of their right to present a defense. But all of the majority and concurring judges participating in those cases agreed that this court should first review the trial court's assessment of relevance for abuse of discretion.

essential element of the crime [of telephone harassment]," but the jury must still be instructed on what amounts to a true threat. *State v. Meneses*, 149 Wn. App. 707, 713, 205 P.3d 916 (2009), *aff'd in part*, 169 Wn.2d 586 (2010). A true threat occurs when "'a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person.'" *Tellez*, 141 Wn. App. at 482 (applying this standard in a telephone harassment case) (alteration in original) (internal quotation marks omitted) (quoting *State v. Kilburn*, 151 Wn.2d 36, 43-44, 84 P.3d 1215 (2004)). Thus, Collier was entitled to argue to the jury that his threats did not rise to the level of true threats.

B.      Relevance of S.C.'s Death to the Crimes Charged

The trial court admitted evidence concerning S.C.'s medical condition, including her cerebral palsy and epilepsy, but excluded any evidence concerning her death, concluding it was irrelevant.

We review the trial court's relevancy determination for abuse of discretion. *See Jones*, 168 Wn.2d at 720; *State v. Blair*, 3 Wn. App. 2d 343, 350-52, 415 P.3d 1232 (2018); *State v. Horn*, 3 Wn. App. 2d 302, 310-11, 415 P.3d 1225 (2018). To show a violation of the right to present a defense, the excluded evidence—namely, testimony or other evidence concerning S.C.'s death—must first be relevant. *See Jones*, 168 Wn.2d at 720; *Blair*, 3 Wn. App. 2d at 350-52; *Horn*, 3 Wn. App. 2d at 310-11. There is no constitutional right to present irrelevant evidence. *Jones*, 168 Wn.2d at 720. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Washington courts recognize that there is a low bar for admission of relevant evidence. *Darden*, 145 Wn.2d at 621.

14

The State argues that Collier's "state of mind was relevant only insofar as it touched on the mental state for" the crimes charged: felony harassment, telephone harassment, and violation of a protection order. Br. of Resp't. at 9-10. As to the statutory elements involving Collier's mental state, we agree that S.C.'s death was not relevant. When the State initially charged Collier, S.C. was alive. Therefore, her later death could not have been minimally relevant to the statutory elements concerning his mental state at the time the crimes were committed.

On appeal, though, Collier's main argument is that evidence of S.C.'s death was relevant insofar as it tends to show that his statements to Manley were not "true threat[s]." Br. of Appellant at 15. He argues that instead they were statements made "out of desperation in an attempt to get [Manley's] attention because of his concern about her inability to care for their children." Reply Br. of Appellant at 5 (internal quotation marks omitted). Thus, Collier argues, he had a right to elaborate on the context in which he made the statements, S.C.'s death was relevant to establishing that his concern for S.C.'s safety was justified, and his distress legitimately motivated his choice of words. We find this argument unpersuasive.

Collier's subjective intent or motivation was irrelevant. "The [true threat] test is an objective one." *Meneses*, 149 Wn. App. at 713. Moreover, it was not an abuse of discretion for the trial court to find the fact of S.C.'s later death was not probative. Collier testified that S.C. had cerebral palsy and epilepsy. He testified that he contacted Child Protective Services because he was concerned about how Manley was taking care of S.C. He also testified that he had no subjective intent to hurt Manley or S.C., but it was his intent to get her attention. Even Manley testified that she was "[o]ne thousand percent" sure that Collier would not hurt her. 4 VRP at

15

217-18. Considering the testimony presented at trial, S.C.'s later death was not relevant even in light of Collier's theory of the case.

Because Collier has not shown that evidence of S.C.'s later death was relevant, we conclude his constitutional argument fails. The trial court did not abuse its discretion when it found that evidence of S.C.'s later death was not relevant.

### III. SUFFICIENCY OF THE EVIDENCE

Collier argues that the State presented insufficient evidence to convict him of felony telephone harassment. We disagree.

A. <u>Standard of Review and Proof of Telephone Harassment</u>

The standard for evaluating the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). In a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *Id*. We defer to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness of evidence. *State v. Curtiss*, 161 Wn. App. 673, 693, 250 P.3d 496 (2011). Further, we view circumstantial evidence and direct evidence as equally reliable in evaluating the sufficiency of the evidence. *Id*.

To support a conviction for telephone harassment, the State must prove, among other things, that the defendant initiated the phone call with intent to harass or intimidate the person he was calling, and that the defendant threatened harm or death. RCW 9.61.230; CP at 99 (jury instruction on telephone harassment). Under RCW 9.61.230(1)(c), the State must prove the

16

defendant threatened to inflict injury on the person called or their household members. Whether the crime is a felony or misdemeanor depends on the nature of the threat. RCW 9.61.230. To support felony telephone harassment, the State must prove that the defendant threatened to kill the victim or any other person. RCW 9.61.230(2)(b).[4]

B.      Evidence Proving Collier Initiated the Phone Calls

Collier argues the State failed to prove that he initiated the threatening telephone calls. We disagree.

In *State v. Lilyblad*, our Supreme Court explained that to prove telephone harassment, "[t]he person called must be the same person threatened" and the defendant must have initiated the call to the victim. 163 Wn.2d 1, 8-11, 177 P.3d 686 (2008). Even if someone other than the victim initially answered the phone, the elements of telephone harassment can still be met so long as at the time the defendant placed the call, he intended to reach the victim, and he ultimately communicated the threat to the intended person. *State v. Sloan*, 149 Wn. App. 736, 745, 205 P.2d 172 (2009).

The trial court admitted two audio recordings of calls involving Collier and Manley, which took place on October 5 and October 6. Both of the calls centered on Collier's desire to have visitation and/or custody of their daughter, S.C., who was in Manley's custody. Drawing inferences in favor of the State, a rational trier of fact could have concluded that Collier had a clear motive to initiate the calls to Manley because of his desire to have visitation and/or custody

---

[4] Collier also argues that the State failed to prove that Collier's threats caused Manley "reasonable fear." Br. of Appellant at 1-2. But "reasonable fear" is not an element of the felony telephone harassment statute. *See* RCW 9.61.230. Thus, the statute did not require the State to prove Manley's reasonable fear to support the telephone harassment convictions.

of their daughter. More importantly, when the State asked Manley at trial if there was a reason that she felt it was necessary to record the specific calls *from Collier*, Manley did not say that anyone other than Collier had placed the calls. Manley adopted the prosecutor's statement that Collier initiated the calls when she answered the State's question. While Collier testified that he did not initiate the calls, the jury was entitled to weigh Manley's and Collier's testimony, evaluate Collier's credibility, and resolve any conflicts in the testimony to determine whether Collier initiated the telephone calls. *See Curtiss*, 161 Wn. App. at 693.

Drawing all inferences in favor of the State, a rational jury could have concluded from the testimony that Collier placed the calls intending to reach Manley.

C.      Evidence Proving "True Threats" and Intent to Harrass, Intimidate, or Torment

The trial court instructed the jury consistent with the applicable law that to be a true threat,

> a statement . . . must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement . . . would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

CP at 101. Collier argues that the State failed to prove beyond a reasonable doubt that he made a "true threat." Br. of Appellant at 20. We disagree.

"The test is an objective one." *Meneses*, 149 Wn. App. at 713. It is difficult to imagine a context in which an objectively reasonable person would not consider Collier's statements to be a serious expression of his intent to carry out the threats. In his calls, Collier uttered multiple specific threats to kill Manley with a gun or knife, bury her in the ground, or have the "street" come after her. Ex. 1; 4 VRP at 212, 251, 295. He repeated other threats of violence should Manley not allow him to see their daughter, despite the no contact order.

18

Manley's reaction at the time was consistent with the conclusion that Collier's statements were true threats. The State's witnesses testified to the fear Manley exhibited shortly after receiving Collier's threats. Manley took Collier seriously enough that she and her friend recorded the telephone calls, she fled to another county, she checked into a hotel under a different name, and she contacted the police. Collier relies on Manley's trial testimony that she was "[o]ne thousand percent" sure that Collier would not harm her or her children. *Id*. Nevertheless, Bobbie testified that Manley took the threats seriously at the time.

The same evidence supporting the true nature of the threats also supports a finding that Collier intended to harass, intimidate, or torment. Collier admitted that he threatened Manley and their children "to get her attention" because he wanted to see his daughter, reflecting an intent to intimidate. 4 VRP at 289, 291. The serious and specific nature of the threats also supports the necessary finding of intent.

The jury was entitled to weigh the testimony, resolve any conflicts, and draw reasonable inferences. *Curtiss*, 161 Wn. App. at 693. Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient for a reasonable jury to find Collier made true threats beyond a reasonable doubt. We also conclude that there was sufficient evidence to prove that Collier intended to harass, intimidate, or torment, regardless of Manley's statement at trial that she was not afraid.

IV. CUMULATIVE ERROR

Collier argues that cumulative error deprived him of a fair trial. We disagree. Based on the analysis above, we find no error that entitles Collier to relief. Therefore, there was no

No. 50879-6-II

cumulative error. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000) (cumulative error doctrine applies only where combined errors deny a defendant a fair trial).

CONCLUSION

We affirm Collier's convictions for telephone harassment. The trial court did not abuse its discretion when it admitted evidence of Collier's prior conviction under ER 404(b) or when it found that evidence of S.C.'s later death was not relevant. Moreover, the State presented sufficient evidence to prove Collier made "true threats" and that Collier initiated the telephone calls to Manley and threatened to kill her with intent to harass, intimidate, or torment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Worswick, J.

Maxa, C.J.

20