# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  50934-2-II |
| Respondent/Cross Appellant, | UNPUBLISHED OPINION |
| v. | |
| RONALD WITTHAUER, | |
| Appellant/Cross Respondent. | |

GLASGOW, J. — Ronald Witthauer appeals from his convictions of second degree rape and indecent liberties with forcible compulsion, where his victim was his adult niece, CZ.  At trial, the State presented DNA and other physical evidence, whereas Witthauer's account of what happened changed several times up to and including at trial.

Witthauer argues that the trial court erred when it prevented him from cross-examining CZ about the prior revocation of her pharmacy technician license and that the prosecutor committed misconduct during cross-examination of him and during closing argument.  He also asserts cumulative error deprived him of a fair trial.  He contends that the court erred in imposing a condition of community custody requiring him to obtain a chemical dependency evaluation.  He also filed a statement of additional grounds.

The State cross-appeals, arguing the trial court improperly merged Witthauer's convictions of second degree rape and indecent liberties with forcible compulsion during sentencing.

We affirm Witthauer's convictions. We affirm in part and reverse in part Witthauer's sentence and remand for the trial court to either make the requisite chemical dependency finding or strike the challenged community custody condition.

FACTS

I. CZ'S ALLEGATIONS AND THE INVESTIGATION

CZ[1] and her friend took their children swimming at a river on a midsummer day. While they were there, CZ was talking to Witthauer about his recent breakup, first via Facebook and then via phone call. Witthauer told CZ he was depressed about the breakup and asked her if she would meet him so they could talk.

Witthauer, driven by his friend, Dan Hainley, then picked CZ up from a nearby Wal-Mart while her friend took the children to her house. CZ's friend testified that the plan was for CZ to come pick up her son later that evening.

Witthauer was visibly intoxicated when he arrived. CZ denied drinking or consuming drugs earlier that day, but she did have a couple sips of vodka in the car as Hainley drove them. Rather than take CZ home as she expected, Hainley drove them to the home of CZ's grandmother (Witthauer's mother), where Witthauer had a motor home parked on the property.

Witthauer asked CZ to stay and have a beer with him, and she agreed to stay for a short while. Witthauer then brought CZ a beer—already opened—and they sat outside and started to

---

[1] We use initials to protect the victim's privacy.

2

drink. After a few sips, CZ began to feel dizzy; she tried to stand but fell down because her legs "were like jello." Verbatim Report of Proceedings (VRP) (Vol. 3) at 219-20. CZ testified that she was terrified and wanted to call her husband, but she had left her phone in Hainley's truck.

Witthauer picked CZ up and carried her into the motor home, telling her that she was drunk and she needed to "sleep it off." VRP (Vol. 3) at 220-21. CZ said she yelled at Witthauer to call her husband to pick her up and take her home; Witthauer told CZ he had called her husband, but she did not believe him. Witthauer put her on the bed in the motor home, and then went back outside with Hainley.

CZ testified that she laid face down on the bed, unable to move, until she eventually lost consciousness. She woke up to the sound of Hainley's truck starting up and Hainley and Witthauer saying goodbye as Hainley drove off.

Witthauer then came into the motor home and asked CZ if she wanted to have sex with him. CZ, still unable to move, told him: "No; you're not funny. This is why people don't like you when you drink." VRP (Vol. 3) at 225. Witthauer responded that he was not joking and asked again if CZ wanted to have sex. She again said no, but Witthauer got on the bed and straddled the backs of her legs. CZ tried to push him away, but he grabbed her arm and pinned it to the bed as he pulled down her pants. CZ then tried to protect her vagina with her hand, but Witthauer pulled it away, pressed down on her neck, and put his penis in her vagina. At some point during the rape, Witthauer also put his finger in CZ's anus. CZ lost consciousness during part of the rape, but was awake when Witthauer finished, at which point he threw a blanket over her, told her he loved her, and went to bed a few feet away.

CZ eventually got up and tried to leave, but the door was locked so she was forced to spend the night in the motor home. She testified that she was terrified and thought Witthauer would kill her if she tried to get away. She also testified that she never thought he would do something like that to her, and she never would have gone with him that day if she had not trusted him as her uncle.

The next morning, Witthauer behaved as though nothing had happened. He told CZ her husband had been calling his phone. Witthauer then called CZ's husband and put the phone on speaker and stayed with CZ as she talked to her husband. CZ testified that she did not tell her husband anything about the rape because Witthauer was standing right there with the phone on speaker.

Witthauer then drove CZ home, still acting as though nothing had happened. They stopped to see Witthauer's friend, Tom Goringe, on their way, but CZ did not disclose anything to Goringe because she was humiliated and worried about what Witthauer might do. CZ testified that her goal was to "get out of that car alive" and to "[g]et home safe." VRP (Vol. 3) at 235-36.

When CZ got home, she called a close friend, Ramona Lowe, and disclosed what happened. Lowe testified that CZ was hysterical and crying so much she could barely talk. Lowe told CZ to call the police and go to the hospital for a sexual assault examination. CZ and her husband went to a hospital in Portland, Oregon later that day, where she underwent a sexual assault examination and made a report to the police.

CZ told her examining nurse, Jane Valencia, about how Witthauer had raped her and held her down by her neck. During the examination Valencia noted abnormal redness and swelling in and around CZ's vagina, white fluid in her vagina, and scratches on CZ's arms and the back of

4

her neck. However, Valencia could not say whether the vaginal redness and swelling resulted from the rape or from CZ's sexual intercourse with her husband two days prior. Valencia took blood and urine samples from CZ, and also collected oral, vaginal, and cervical swabs.

CZ's blood samples showed no signs of drugs or alcohol, but her urine samples contained alcohol and the prescription drug clonazepam, a central nervous system depressant that slows down brain activity, impairs motor skills, and can cause drowsiness and confusion, particularly when combined with alcohol. Justin Knoy, a forensic toxicologist, testified that the test results were consistent with a person consuming alcohol and clonazepam about 12 hours prior to the sample being taken, though consumption could have occurred earlier or later.

In early August, Detective Elizabeth Luvera interviewed Witthauer, who told her that CZ was drunk when he picked her up, that he slept in his truck that night, and that he did not have sex with CZ. Witthauer also voluntarily gave Luvera a sample of his DNA.

CZ said that she and her husband use condoms when they have sex because she has a sensitivity to semen that causes a burning sensation; she testified that she knew Witthauer had ejaculated in her because her vagina was burning badly. The sample that Witthauer provided matched DNA from sperm cells found in CZ's vaginal and cervical swabs. After receiving the DNA results, Detective Fred Nieman went to Witthauer's motor home and took him into custody. Also after the DNA test results revealed his DNA was in CZ's vagina, Witthauer told family members that there was a conspiracy against him to plant his DNA inside CZ.

## II. PRETRIAL MOTION AND ORDER

Before trial, the State moved to exclude extrinsic evidence and limit cross-examination regarding the Oregon Board of Pharmacy's prior revocation of CZ's pharmacy technician

license. Witthauer sought to admit a letter from the Board to CZ, along with a certified copy of a default order against her, revoking her license based on an allegation that she had used patients' prescriptions to illegally obtain oxycodone for her own use. The trial court noted on the record that the order was entered by default, because CZ never responded to the notice of proposed disciplinary action.

The trial court found that whether CZ dishonestly obtained prescriptions and then diverted oxycodone was probative of CZ's truthfulness. The trial court ruled that the defense could ask whether she did these things on cross-examination. But under ER 608(b), the inquiry would end with CZ's answer and Witthauer could not further inquire, even if she denied it. The court also ruled that Witthauer could not ask CZ about her license revocation or present extrinsic evidence to show her license had been revoked. The court reasoned that the revocation order

> does not state where the allegations arose from; in other words, which people advised the investigator, or testified at the hearing, or otherwise let the Board of Pharmacy know that [CZ] was alleged to have done these things in December of 2014. There's no admission or other indication from her that, in fact, she did these things, only that she didn't contest the proceeding.

VRP (Vol. 1) at 37.

### III. RELEVANT TRIAL TESTIMONY AND ARGUMENT

At trial, during his cross-examination of CZ, defense counsel asked if she had ever been "accused" of diverting oxycodone, but the State objected based on the court's pretrial ruling and the court sustained the objection. VRP (Vol. 4) at 295. Defense counsel then asked if CZ had ever diverted oxycodone for her own use, and she said she had not. Counsel asked once more, and CZ again said "[n]o." VRP (Vol. 4) at 295. Counsel then moved on to another line of inquiry.

6

A DNA expert testified to the DNA match. During his testimony, Witthauer admitted that he had sex with CZ, but said it was consensual. Witthauer also admitted that he had lied many times to detectives and his friends and family when he said he had not had sex with CZ, and he invented a conspiracy theory in order to protect himself.

During cross-examination, the State asked Witthauer how many nieces he had, and how many of them he had had sex with. Witthauer responded that he had four nieces, and he had had sex with one of them. The State responded: "Would that answer change if there was DNA evidence about other people?" VRP (Vol. 7) at 780. Defense counsel promptly objected, and the trial court sustained the objection, instructing the jury to "[d]isregard any questions or answering concerning allegations of misconduct with anyone else." VRP (Vol. 7) at 781. The State then moved on to another topic.

As a final and last minute witness, Witthauer called CZ's mother. Defense counsel tried to elicit from her details about multiple phone calls to family members that CZ allegedly made on the day of the rape. Defense counsel apparently hoped to support the defense theory that CZ was upset with her husband that day and had turned to consensual sex with her uncle for comfort. CZ's mother testified that she could not remember the details of that day and that she had significant health problems, including recent strokes, that affected her memory.

The trial instructed the jury that "[a] reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence." Clerk's Papers (CP) at 23. In closing argument, the prosecutor reiterated the definition of a "reasonable doubt" as "a doubt for which a reason can be given." VRP (Vol. 8) at 856. Witthauer did not object.

7

Also during closing argument, as part of a broader discussion of the relative credibility of witnesses, the prosecutor discussed Witthauer's last minute decision to call CZ's mother as a defense witness. The prosecutor noted CZ's mother's serious medical and memory problems and said: "And you know, that—that's just really kind of a shame. . . . I don't say that to be, you know, rude to her. But, I mean, what is that? Who hangs their hat on that in a case? Why would you even present that evidence if not as a distraction? It's just—it's a shame." VRP (Vol. 8) at 876-77. Witthauer did not object.

The jury convicted Witthauer of second degree rape and indecent liberties with forcible compulsion. The jury also found that he had used his position of trust, confidence, or fiduciary responsibility to facilitate the commission of both crimes.

## IV. SENTENCING

During sentencing, the court stated in its oral ruling that the two crimes merged, and that it would only sentence Witthauer on his conviction for second degree rape. The State disagreed, noting that merger and same criminal conduct are different concepts. The trial court did not revisit the issue in the hearing. However, in its final written ruling, the court found that the two crimes encompassed the same criminal conduct. The court sentenced Witthauer to 144 months to life imprisonment. The court also imposed a condition of community custody requiring Witthauer to complete a chemical dependency evaluation, without making a finding that such a dependency had contributed to the commission of his crimes.

Witthauer appeals his conviction and sentence, and the State cross-appeals the court's verbal finding that the two crimes merged.

8

ANALYSIS

I. CROSS-EXAMINATION OF CZ

Witthauer argues the trial court denied him his right of confrontation by limiting the scope of his cross-examination of CZ. Specifically, he asserts the trial court improperly prevented him from asking her about the disciplinary proceeding that led to the revocation of her pharmacy technician license. We disagree.

A. Right of Confrontation, ER 608(b), and Standard of Review

Criminal defendants have a constitutional right to confront and cross-examine adverse witnesses. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Davis v. Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1005, 39 L. Ed. 2d 347 (1974). In *State v. Jones*, our Supreme Court reiterated its analysis for determining whether the exclusion of evidence violates a defendant's constitutional right to present a defense. 168 Wn.2d 713, 720, 230 P.3d 576 (2010). The evidence that a defendant desires to introduce "'must be of at least minimal relevance'" because a defendant has no right to present irrelevant evidence. *Id.* (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). To prevail on a claim that he was deprived of his Sixth Amendment right, the defendant must at least make some plausible showing of how the subject of his cross-examination would have been both material and favorable to his defense. *State v. Gonzalez*, 110 Wn.2d 738, 750, 757 P.2d 925 (1988); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982).

Even though there has been a recent split of authority about the structure of the legal test for establishing a Sixth Amendment violation when a trial court excludes a defendant's proffered evidence, all of the cases agree that our first step is to review for abuse of discretion the trial

court's assessment of whether the excluded evidence was relevant. *State v. Lee*, 188 Wn.2d 473, 486-88, 396 P.3d 316 (2017); *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017); *State v. Blair*, 3 Wn. App. 2d 343, 350-52, 415 P.3d 1242 (2018); *State v. Horn*, 3 Wn. App. 2d 302, 310-11, 415 P.3d 1225 (2018).

In this case, Witthauer argued in the trial court that he should have been permitted to cross-examine CZ about her license revocation based on ER 608(b). Under that rule, a party may inquire into specific instances of a witness's prior conduct, for purposes of impeachment, if the conduct is probative of the witness's truthfulness or untruthfulness. ER 608(b). Conduct involving fraud or deception can be indicative of the witness's general disposition with regard to truthfulness. *State v. Johnson*, 90 Wn. App. 54, 71, 950 P.2d 981 (1998). However, a witness's prior bad act may not be relevant when it is unrelated to the issues of the case. "The confrontation clause primarily protects 'cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness *as they may relate directly to issues or personalities in the case at hand*.'" *Lee*, 189 Wn.2d at 489 (quoting *Davis*, 415 U.S. at 316). Although a trial court's ruling limiting the scope of a defendant's cross-examination of a witness under ER 608(b) may implicate the constitutional right to confrontation, a defendant nevertheless has no constitutional right to the admission of irrelevant evidence. *See State v. O'Connor*, 155 Wn.2d 335, 348-49, 119 P.3d 806 (2005).

Moreover, ER 608(b) expressly does not permit introduction of extrinsic evidence to prove specific instances of conduct. Instead, the party attacking the witness's credibility may only inquire into those instances on cross-examination. ER 608(b). "Specific instances on the conduct of a witness . . . may not be proved by extrinsic evidence." ER 608(b). As a result, if a

witness denies the alleged conduct, the examining attorney cannot impeach using extrinsic evidence.

ER 608(b) expressly leaves the scope of cross-examination "in the discretion of the court." We therefore review a trial court's decision to admit or exclude evidence under ER 608(b) for abuse of discretion. *See Lee*, 188 Wn.2d at 486. Even where a defendant raises a Sixth Amendment argument regarding the exclusion of evidence, we review for abuse of discretion whether the trial court properly evaluated the relevance or probative value of the evidence. *See, e.g.*, *Id.* at 486-88; *Clark*, 187 Wn.2d at 648-49.

B.      Evidence of CZ's License Revocation

Witthauer argues the trial court erred in limiting cross-examination to asking CZ only whether she had ever diverted oxycodone for her own use. He was not permitted to ask whether she had ever been accused of doing so or ever had her pharmacy technician license revoked in a disciplinary proceeding for that reason. He argues that an inquiry into the disciplinary proceeding was relevant because "CZ's credibility was the linchpin of the State's case, and her history of dishonest conduct [Witthauer's] most cogent line of defense." Br. of Appellant at 24. Witthauer reasons that an inquiry into disciplinary proceedings for diverting oxycodone was also relevant because CZ claimed she did not know how the clonazepam got into her system, implying that Witthauer had drugged her.

However, the trial judge explained on the record that CZ's license revocation occurred as the result of a default order against her because she never responded to the allegations. Therefore, evidence of her license revocation was not probative of her truthfulness because all it

11

would demonstrate was that she was accused of doing something dishonest and she did not respond to the accusation, not that she actually engaged in any dishonest conduct.

We hold that the trial court did not abuse its discretion. Testimony or evidence that actually demonstrated that CZ committed dishonest acts would be relevant to her truthfulness, and the trial court engaged in the appropriate ER 608(b) analysis allowing cross-examination of the alleged dishonest conduct—whether she diverted oxycodone. But the Board's default order shows only that she was accused of dishonesty and did not contest the resulting disciplinary proceeding. Such evidence is not relevant. Nor would it be reliably probative of whether she actually committed the acts she was accused of because parties default for reasons other than guilt. It was within the trial court's discretion to allow cross-examination regarding whether CZ had ever committed the specific instances of dishonest conduct, but to prohibit any inquiry into whether she had been accused of or disciplined for such conduct, when evidence of this particular disciplinary proceeding would not reveal the truth of the underlying accusation.

We hold that the trial court properly limited Witthauer's cross examination. Because a disciplinary proceeding resolved by default was not relevant or probative, its exclusion did not violate ER 608 or the Sixth Amendment.

## II. PROSECUTORIAL MISCONDUCT

Witthauer claims the prosecutor committed misconduct during his cross-examination of Witthauer, when arguing the State's burden of proof, and when commenting on the role of defense counsel. We conclude that none of the challenged statements require reversal.

12

A.      Burden to Show Prosecutorial Misconduct

To prevail, Witthauer bears the burden to show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. *See State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). When a claim is made that the prosecutor committed misconduct during closing argument, we review the prosecutor's statements "within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

Where the defendant objected at trial, they must show there is a "substantial likelihood" the improper statements affected the jury's verdict. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). However, "[t]he 'failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" *Thorgerson*, 172 Wn.2d at 443 (quoting *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)). Moreover, the "[f]ailure to request a curative instruction or move for a mistrial 'strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.'" *In re Det. of Law*, 146 Wn. App. 28, 51, 204 P.3d 230 (2008) (quoting *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

B.      Cross-Examination of Witthauer

Witthauer first argues that the prosecutor committed misconduct by suggesting during cross-examination that Witthauer had victimized his other nieces. Witthauer objected. The court sustained Witthauer's objection and told the jury to disregard that line of questioning. The prosecutor moved on to another topic.

We presume the jury follows the court's instructions absent evidence to the contrary. *State v. Montgomery*, 163 Wn.2d 577, 596, 183 P.3d 267 (2008). Where the trial court has sustained an objection, to warrant reversal for prosecutorial misconduct, the defendant must show a substantial likelihood the exchange affected the jury's verdict. *Magers*, 164 Wn.2d at 191.

Witthauer has failed to show that the jury ignored the trial court's instruction that it should disregard the questions and answers about Witthauer's other nieces or that a substantial likelihood exists that the exchange affected the jury's verdict. Witthauer argues that admission of extrinsic evidence concerning commission of other crimes is inherently difficult for the jury to disregard, citing *State v. Escalona*, 49 Wn. App. 251, 255-56, 742 P.2d 190 (1987).

This case is distinguishable from *Escalona*. In that case, the victim gave unsolicited testimony that the defendant, who was charged with assaulting him with a knife, "already ha[d] a record and had stabbed someone." *Escalona*, 49 Wn. App. at 255. On appeal, the court held that although the trial court had sustained Escalona's objection and instructed the jury to disregard the testimony, the statement was "inherently prejudicial," in light of the weakness of the State's case, because it suggested the defendant had committed a nearly identical crime in the past. *Id*. at 256.

14

Here, unlike in *Escalona*, there was a brief series of questions from the prosecutor improperly implying that Witthauer may have victimized his other nieces, but there was no testimony to lend credence to the improper questioning. Given the brief exchange, Witthauer's denial, the court's swift and decisive ruling on the matter, and the instruction to the jury to disregard the question, it is unlikely the jury understood the questions to mean that Witthauer had committed other crimes. Also, defense counsel's failure to move for mistrial suggests he did not conclude that the State's question so prejudiced the jury that it would deprive Witthauer of a fair trial. *See Law*, 146 Wn. App. at 51.

Furthermore, the State's evidence here was not weak. CZ's account of what happened was unwavering from the morning after the incident through trial. Her testimony was corroborated by DNA evidence as well as visible physical injuries observed on the day after the rape. Witthauer constantly changed his account of what happened. He initially denied sexual contact with CZ. Then, after DNA results showed the presence of his semen in CZ's vagina, he said there was a conspiracy to steal his DNA and plant it on CZ. At trial Witthauer testified that he had consensual sex with CZ.

The prosecutor's questions here, while improper, were not so prejudicial in light of all of the evidence that they denied Witthauer a fair trial. We hold that Witthauer has not shown a substantial likelihood that the State's line of questioning improperly affected the jury's verdict.

C.      State's Explanation of Its Burden of Proof

Next, Witthauer argues the prosecutor committed misconduct by misstating the reasonable doubt standard thereby shifting the burden of proof to the defense during closing argument. Specifically, Witthauer argues the prosecutor's statement here is analogous to "fill-in-

the-blank" arguments, which Washington courts have held to be improper. Br. of Appellant at 35. We disagree.

In closing, the prosecutor recited the definition of a "reasonable doubt" as "a doubt for which a reason can be given." VRP (Vol. 8) at 856. Witthauer did not object. The court's actual instructions to the jury defined "reasonable doubt" as "one for which a reason exists and may arise from the evidence." CP at 23

"[T]he law does not require that a reason be given for a juror's doubt." *State v. Kalebaugh*, 183 Wn.2d 578, 585, 355 P.3d 253 (2015). It is improper for the State to argue, "in order to find the defendant not guilty, you have to say 'I don't believe the defendant is guilty because,' and then you have to fill in the blank." *State v. Anderson*, 153 Wn. App. 417, 431, 220 P.3d 1273 (2009) (quoting VRP (Vol. 4) at 327-28). But, the *Anderson* court explained that a prosecutor's statement that "a 'reasonable doubt' is one for which reason exists," was "not inaccurate." *Id.* at 430

Here, the prosecutor's explanation of the State's burden of proof did not amount to an improper fill-in-the-blank argument. The prosecutor did not elaborate to suggest the jury actually had to articulate a reason why Witthauer was innocent. Moreover, after making the statement Witthauer complains of, the prosecutor correctly explained the State's burden of proof, using language that adhered to the relevant jury instruction, saying: "[I]f, as you discuss the case, as you consider the evidence, fairly and fully, you have an abiding belief, a belief that lasts, a belief that endures that the defendant did these things to [CZ], [then] you are convinced as the law requires." VRP (Vol. 8) at 856; *see* CP at 23. Unlike in *Anderson*, here, the prosecutor directed the jurors to the instruction given by the trial court.

In sum, the prosecutor's statement did not impermissibly subvert Witthauer's presumption of innocence. It was not a fill-in-the-blank argument and, in context, it did not suggest that Witthauer had the burden to prove his innocence. We hold this statement was not improper.

D.      State's Comments on Defense Counsel

Witthauer also argues the prosecutor committed misconduct by "disparaging . . . defense counsel" during his closing argument. Br. of Appellant at 38. In discussing CZ's mother's testimony, the prosecutor noted her serious medical and memory problems and stated: "And you know, that—that's just really kind of a shame. . . . I don't say that to be, you know, rude to her. But, I mean, what is that? Who hangs their hat on that in a case? Why would you even present that evidence if not as a distraction? It's just—it's a shame." VRP (Vol. 8) at 876-77. Witthauer did not object.

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." *Thorgerson*, 172 Wn.2d at 451. *Thorgerson* held it was improper for the prosecutor to refer to defense counsel's arguments as "bogus" or involving "sleight of hand" because such arguments imply "wrongful deception or even dishonesty." *Id.* at 451-52. Other cases holding a prosecutor's statement to be improper in this context have likewise involved suggestions that defense counsel was being dishonest or untrustworthy. *See State v. Warren*, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008) (claim that defense counsel's argument was "taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are doing."); *State v. Gonzales*, 111 Wn. App. 276, 283-84, 45 P.3d 205 (2002) (claim that prosecutors, unlike defense counsel, take

an oath to "see that justice is served."); *State v. Negrete*, 72 Wn. App. 62, 66-67, 863 P.2d 137 (1993) (claim that defense counsel was being paid to twist the words of a witness).

The prosecutor suggested defense counsel only called CZ's mother as a distraction, and in doing so impugned his integrity. The comment also disparaged the choice to rely on a witness with CZ's mother's health problems. Nevertheless, Witthauer has not established that the remark was so flagrant and ill-intentioned that it could not have been cured by instruction. *See Negrete*, 72 Wn. App. at 67-68; *Warren*, 165 Wn.2d at 30. Therefore, because Witthauer did not object, he waives any error.

### III. CUMULATIVE ERROR

The cumulative error doctrine does not warrant reversal where the errors are few and have little or no effect on the trial's outcome. *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). Witthauer bears the burden of showing cumulative error. *State v. Asaeli*, 150 Wn. App. 543, 597, 208 P.3d 1136 (2009). He has failed to do so here.

As discussed above, Witthauer waived any claim of error with respect to the prosecutor's statements disparaging defense counsel. And there was no error with respect to the trial court's limitation of his cross-examination of CZ or the State's explanation of its burden of proof. Hence, the State's improper cross-examination of Witthauer was the only preserved error, and we have already concluded that Witthauer was not prejudiced. Accordingly, we reject Witthauer's claim of cumulative error.

IV.  CONDITIONS OF COMMUNITY CUSTODY

Witthauer challenges his condition of community custody that requires him to obtain a chemical dependency assessment. We agree that this condition should be reversed.

A trial court lacks authority to impose a community custody condition unless it is authorized by statute. *State v. Kolesnik*, 146 Wn. App. 790, 806, 192 P.3d 937 (2008). In order to require an offender to obtain a chemical dependency evaluation, the court must find that the offender has a chemical dependency that contributed to his or her offense. RCW 9.94A.607(1); *State v. Warnock*, 174 Wn. App. 608, 612, 299 P.3d 1173 (2013).

The State concedes that the trial court made no express finding that Witthauer suffers from chemical dependency, and so this condition must be stricken unless the court makes such a finding on remand. We reverse the condition of community custody that requires Witthauer to obtain a chemical dependency assessment and remand for the court to either make the requisite finding or strike the condition.

V.  STATE'S CROSS-APPEAL

In its cross-appeal, the State argues the trial court improperly merged Witthauer's convictions for indecent liberties and second degree rape. During sentencing, the court stated: "I find the two cases merge, so I will not impose a separate sentence on Count II of that crime." VRP (Vol. 8) at 909. However, Witthauer's judgment and sentence states only that the two crimes constituted the same criminal conduct, a conclusion that the State agreed to at sentencing and concedes is correct on appeal.

Although the State claims the court "enter[ed] a finding" that the two offenses merged, Reply Br. of Resp't. at 1, a superior court's verbal ruling is not binding unless it is formally

incorporated into the written findings, conclusions, and judgment. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 84, 432 P.3d 459 (2019). "When the superior court's written findings are unambiguous, it is unnecessary to look to the oral ruling." *Id.*

Witthauer's judgment and sentence unambiguously listed both convictions and their offender scores, and shows that the two convictions encompassed the same criminal conduct. Any verbal ruling that the crimes merged was not binding, and we need not look any further than the trial court's unambiguous written ruling. *Id.* Because the State concedes the crimes constitute same criminal conduct, the State shows no error in the judgment and sentence.

VI. STATEMENT OF ADDITIONAL GROUNDS

In his statement of additional grounds, Witthauer raises several claims of ineffective assistance of counsel. None of his claims supports reversal.

Witthauer argues that his defense counsel was ineffective for failing to call an expert rebuttal witness to counteract nurse Valencia's testimony, and for failing to interview his friend, Goringe, whom he and CZ visited the morning after the rape and who died before trial. Both of these alleged errors rely on evidence that is outside the record before us so we do not consider them in this direct appeal. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Next, Witthauer argues he received ineffective assistance of counsel when his trial counsel failed to object to the prosecutor's allegedly improper remarks during closing argument discussed above. Because we held above that the prosecutor's comments during closing argument did not amount to misconduct requiring reversal, counsel was not ineffective for failing to object.

No. 50934-2-II

## CONCLUSION

We affirm Witthauer's convictions. We affirm in part and reverse in part Witthauer's

sentence and remand for the trial court to either make the requisite chemical dependency finding

or strike the challenged community custody condition.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Glasgow, J.

We concur:

Worswick, J.

Lee, A.C.J.